**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**-------------------------------------------------------------x**
**R.K., BY HER PARENTS R.K. and S.L.,**

**Plaintiffs-Appellants,**

**-against-**

**NEW YORK CITY DEPARTMENT OF EDUCATION,**

**Defendant-Appellee.**
**-------------------------------------------------------------x**

**REPORT AND RECOMMENDATION**

**09-CV-4478 (KAM)**

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff-appellant R.K., a minor child, by her parents R.K. and S.L. (the "Parents") (collectively, "plaintiffs"), filed this action against defendant-appellee New York City Department of Education (the "DOE" or "defendant"), seeking relief under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and regulations promulgated thereunder, as well as the New York State Education Law and its implementing regulations. Currently pending before this Court, on a referral from the Honorable Kiyo A. Matsumoto, are the parties' cross-motions for summary judgment.

For the reasons that follow, having concluded that defendant failed to offer R.K. an adequate special education placement for the 2008-2009 school year, this Court respectfully recommends that plaintiffs' motion be granted, that defendant's motion be denied, and that plaintiffs be awarded full tuition reimbursement for R.K.'s alternate placement.

## BACKGROUND[1]

### I. PROCEDURAL OVERVIEW

R.K. is now a seven-year-old child who was diagnosed with autism at the age of two. See Defendant's Local Civil Rule 56.1 Statement of Undisputed Material Facts (July 29, 2010) ("Def. Rule 56.1") ¶ 1, ECF Docket Entry ("D.E.") #22. R.K. received special education services in home-based and then preschool programs up through the 2007-2008 school year.

---

[1] Below is a compilation of many of the acronyms used in this opinion:

| | |
|---|---|
| ABA: | Applied Behavior Analysis (a form of autism therapy, described *infra* note 40) |
| BAC: | Brooklyn Autism Center (alternate educational facility selected by R.K.'s Parents) |
| BIP: | Behavioral Intervention Plan (a plan developed to address behaviors interfering with learning on the part of a child with disabilities) |
| CSE: | Committee on Special Education (in New York, the team responsible for creating an Individualized Education Program, or IEP) |
| DOE: | New York City Department of Education |
| FAPE: | Free appropriate public education (the education program and services mandated by IDEA for children with disabilities) |
| FBA: | Functional Behavioral Assessment (an assessment to ascertain, among other things, the causes of behaviors by a child with a disability that interfere with learning) |
| IDEA: | Individuals with Disabilities Education Act (see *infra* note 5) |
| IEP: | Individualized Education Program (the unique education plan created for each child with a disability) |
| IHO: | Impartial Hearing Officer (the first level of administrative review) |
| NFR: | Notice of Final Recommendation (a DOE notice offering recommended school site for a child with a disability) |
| OT: | Occupational Therapy |
| SEIT: | Special Education Itinerant Teacher (a teacher providing special education services on an itinerant basis to a preschool student with disabilities) |
| SRO: | State Review Officer (the second level of administrative review after decision of the IHO) |
| TEACCH: | Treatment and Education of Autistic and related Communication-Handicapped Children (a form of autism therapy, described *infra* note 40) |

See id. ¶¶ 2, 4; Local Rule 56.1 Statement of Undisputed Facts (July 29, 2010) ("Pl. Rule 56.1") ¶ 7, D.E. #29. On April 29, 2008, a Committee on Special Education ("CSE") Review Team ("CSE Team") met to discuss R.K.'s Individualized Education Program ("IEP")[2] for the upcoming 2008-2009 school year. See Pl. Rule 56.1 ¶ 8, D.E. #29.[3] The DOE's final recommendation involved placing R.K. in a specified school, in a classroom with six students, one special education teacher and one paraprofessional, commonly referred to as a "6:1+1" setting. See Def. Rule 56.1 ¶ 161, D.E. #22; IHO Hearing Transcript ("Tr.") at 28, Exhibit M to Declaration of Kimberly Conway (July 29, 2010), D.E. #23.[4] The Parents notified defendant of their objection to this placement and requested defendant's assistance in placing R.K. in a program that they believed better met R.K.'s needs, for example, by providing a 1:1 student-teacher ratio. See Def. Rule 56.1 ¶¶ 165-67, D.E. #22; Pl. Rule 56.1 ¶ 12, D.E. #29. The Parents advised defendant that if the DOE failed to provide an appropriate placement they would seek an alternate placement independently and pursue reimbursement from the DOE. See Def. Rule 56.1 ¶ 168, D.E. #22; Pl. Rule 56.1 ¶ 12, D.E. #29.

After enrolling R.K. in a private special education institution, the Brooklyn Autism Center ("BAC"), the Parents sought reimbursement of her tuition and therapy services through

---

[2] For an explanation of the term "IEP," see *infra* p. 7.

[3] The team responsible for developing the IEP includes the child's parents, a special education teacher, and a representative of the local educational agency. See 20 U.S.C. § 1414(d)(1)(B). In New York, the IEP team is known as a CSE.

[4] Exhibits to the Conway Declaration are cited as "Conway Ex."

the processes provided in IDEA.[5] Plaintiffs filed an administrative due process complaint requesting an impartial hearing regarding R.K.'s 2008-2009 placement. See Def. Rule 56.1 ¶ 171, D.E. #22. The administrative complaint alleged that the DOE had failed to provide R.K. with a free and appropriate public education ("FAPE"); an amended claim, dated September 30, 2008, alleged substantive and procedural deficits in defendant's IEP and proposed site placement. See id. ¶¶ 171-72, 181-82; Pl. Rule 56.1 ¶ 13, D.E. #29. The Parents sought reimbursement for the costs associated with R.K.'s enrollment at BAC (where she would have the benefit of a 1:1 staffing ratio and Applied Behavior Analysis or "ABA" methodology),[6] as well as reimbursement for related therapy services. See Def. Rule 56.1 ¶ 175, D.E. #22; Pl. Rule 56.1 ¶¶ 14-15, D.E. #29.

Over the course of a two-day hearing conducted before an Impartial Hearing Officer ("IHO") on January 7 and 8, 2009, each side called several witnesses. See Def. Rule 56.1 ¶ 184, D.E. #22; Pl. Rule 56.1 ¶¶ 16-23, D.E. #29. In a written decision issued thereafter, the IHO held that the DOE's recommended placement for the 2008-2009 school year did not provide the ABA program or "level of support" that R.K. required, and that the placement thereby deprived her of a FAPE; nevertheless, because the IHO concluded that R.K. was entitled to a 1:1 program for "only part of the day," she ruled that plaintiffs could not recover

---

[5] IDEA was amended in 2004, effective July 1, 2005, pursuant to the Individuals With Disabilities Education Improvement Act, Pub. L. No. 108-446, 118 Stat. 2647 (2004). Consistent with the practice of many courts construing the amended statute, this Court refers to the current version of the Act as "IDEA."

[6] ABA is a particularly intensive and individualized form of autism therapy. See *infra* note 40.

the full tuition of $85,000,[7] but instead awarded $32,400 as partial tuition reimbursement for the alternate placement. See Amended Findings of Fact and Decision (Feb. 25, 2009) ("IHO Decision") at 5-6, D.E. #28-2.

Plaintiffs appealed the IHO Decision to New York State Review Officer ("SRO") Paul F. Kelly, requesting that it be amended to provide full tuition reimbursement. See Def. Rule 56.1 ¶ 195, D.E. #22. Defendant cross-appealed, challenging the IHO's finding that defendant had failed to offer R.K. a FAPE. See id. ¶ 196; Pl. Rule 56.1 ¶ 42, D.E. #29. The SRO reversed the IHO Decision and denied plaintiffs' reimbursement request in its entirety. See Decision (June 19, 2009) ("SRO Decision") at 1, 19-20, D.E. #28-1.

Plaintiffs initiated the instant action to secure a reversal of the SRO's decision and an award of full tuition reimbursement for the 2008-2009 academic year. See Amended Complaint (Nov. 20, 2009) ("Compl.") ¶ 42, D.E. #4. In cross-moving for summary judgment, the parties employ the common procedural method for resolving IDEA litigation on the basis of the administrative record. Requesting modified *de novo* review of the final administrative decision, plaintiffs demand a judgment awarding them full tuition; defendant cross-moves for judgment affirming the SRO's decision denying tuition reimbursement. See Notice of Motion for Summary Judgment (July 29, 2010), D.E. #20; Motion for Summary Judgment for Modified De Novo Review (July 29, 2010), D.E. #27.[8] On October 20, 2010,

---

[7] Although the IHO, apparently mistakenly, stated that the annual tuition was $90,000, the BAC enrollment contract reflects that it was $85,000. See BAC Enrollment Contract, D.E. #39-49.

[8] Plaintiffs' request for reimbursement for R.K.'s related therapy services is not at issue here,
(continued...)

Judge Matsumoto referred the motions to the undersigned magistrate judge for a Report and Recommendation. See Order Referring Motion (Oct. 20, 2010). This Court heard oral argument on the motions on January 13, 2011. See generally Transcript of Civil Cause For Oral Argument ("1/13/11 Arg."), D.E. #58.

## II. STATUTORY FRAMEWORK

### A. The Statute

IDEA, which was originally entitled the Education for All Handicapped Children Act of 1975, Pub. L. No. 94-142, 89 Stat. 773 (1975), was enacted to promote the education of children with disabilities. See Bd. of Educ. v. Rowley, 458 U.S. 176, 179-80 (1982) ("Rowley"). The purpose of the statutory framework and review mechanisms is "to ensure that children with disabilities receive the educational benefits to which they are entitled." T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009) ("T.Y."). IDEA requires states to offer a FAPE to all children with disabilities. See 20 U.S.C. § 1400(d)(1)(A). A FAPE involves "special education and related services . . . provided at public expense . . . [and] in conformity with [an] individualized education program ['IEP'] . . . ." 20 U.S.C. § 1401(9); see Rowley, 458 U.S. at 187-88 (applying IDEA's statutory definition of "free appropriate public education"). The special education and related services must be "tailored to meet the unique needs of the particular child and be 'reasonably calculated

[8](…continued)
since the DOE agreed to reimburse plaintiffs for the services already paid for and to provide those services through the end of the 2008-2009 school year. See Def. Rule 56.1 ¶ 186, D.E. #22.

to enable the child to receive educational benefits.'" E.S. *ex rel.* B.S. v. Katonah-Lewisboro Sch. Dist., --- F.Supp.2d ---, 2010 WL 3835008, at *1 (S.D.N.Y. Sept. 30, 2010) ("E.S.") (quoting Rowley, 458 U.S. at 207) (additional internal quotations omitted).

An IEP sets out the child's current level of educational performance, annual and short-term goals, the specific services to be provided to the child, and objective evaluation procedures and criteria. See 20 U.S.C. § 1414(d)(1)(A); see also, e.g., E.S., 2010 WL 3835008, at *1. The IEP is developed annually through collaboration between parents, educators, and the local school district. See 20 U.S.C. § 1414(d)(1)(B); Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (citing a prior version of IDEA). As previously noted, the particular team responsible for developing an IEP in New York State is called a "Committee on Special Education" or "CSE." See Walczak, 142 F.3d at 123 (citing N.Y. Educ. Law § 4402(1)(b)(1) (McKinney Supp. 1997-1998)). New York State regulations require each CSE to consider four factors in developing an IEP: "(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." Walczak, 142 F.3d at 123 (citing 8 N.Y.C.C.R.R. § 200.1(kk)(2)(i) (1997) (renumbered as 8 N.Y.C.C.R.R. § 200.1(ww)(3)(i)). The state regulations further require that an IEP "identify a specific class placement." Id.; 8 N.Y.C.C.R.R. § 200.4(d)(2)(xii).

IDEA was crafted to "open the door of public education to handicapped children on appropriate terms . . . ." Walczak, 142 F.3d at 130 (quoting Rowley, 458 U.S. at 192). While an "appropriate" education is not necessarily "one that provides everything that might be thought desirable by loving parents," id. at 132, "the door of education must be opened for

a disabled child in a 'meaningful' way." Id. at 130 (quoting Rowley, 458 U.S. at 192) (additional internal citations omitted). School districts must therefore provide "an IEP that is 'likely to produce progress, not regression,' and . . . [that] affords the student with an opportunity greater than mere 'trivial advancement.'" Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 195 (2d Cir. 2005) (quoting Walczak, 142 F.3d at 130).

**B. *Burlington-Carter* Reimbursement Test**

If parents of a disabled child are dissatisfied with their child's public school placement or otherwise believe their child has been denied a FAPE, they may unilaterally place their child in a private school and seek tuition reimbursement from the local school district. See 20 U.S.C. § 1412(a)(10)(C); M.P.G. *ex rel.* J.P. v. New York City Dep't of Educ., No. 08 Civ. 8051(TPG), 2010 WL 3398256, at *2 (S.D.N.Y. Aug. 27, 2010) ("M.P.G."). Parents may present their request for reimbursement at a hearing before an IHO, whose decision may be appealed to the SRO, who in turn independently reviews the IHO's findings and decision. See M.P.G., 2010 WL 3398256, at *1 (citing 20 U.S.C. § 1415). The decision of the SRO may be reviewed in either state or federal court. Id.

Reviewing officers at both the administrative and judicial levels apply the three-prong "*Burlington-Carter*" test to determine whether the local school district must reimburse parents for private school tuition. See M.P.G., 2010 WL 3398256, at *2. Reimbursement is appropriate when (1) the school district has provided an "inadequate or inappropriate"

placement (i.e., failed to provide a FAPE);[9] (2) the parents' selected program is appropriate; and (3) the equities favor the parents.[10] See, e.g., id.; see also School Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 (1985) ("Burlington"); Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7, 12-13 (1993) ("Carter"). Reimbursement for expenses incurred at a private school may be ordered even if the school is not on a state-approved placement list or fails to meet state educational standards. See Carter, 510 U.S. at 13-14.

## III. FACTS ESTABLISHED IN THE RECORD

Unless otherwise noted, the following facts are undisputed.

### A. R.K.

R.K., who was born on September 4, 2003, has been diagnosed with Autism Spectrum Disorder since the age of two. See Def. Rule 56.1 ¶ 1, D.E. #22; IHO Decision at 2. R.K. initially received home-based early intervention services -- including occupational therapy ("OT"), speech therapy and ABA instruction -- through the Stepping Stone Day School, Inc. ("Stepping Stone"). See Def. Rule 56.1 ¶ 2, D.E. #22.[11] In May 2006, in preparation for her

---

[9] For a school's program to be found adequate and appropriate, the IEP must (1) comply with the procedural requirements of IDEA and (2) substantively, be "reasonably calculated to enable the child to receive educational benefits." Walczak, 142 F.3d at 129 (quoting Rowley, 458 U.S. at 206-07). See also *infra* p. 29 (discussing when a procedural error will satisfy the first prong of the *Burlington-Carter* test).

[10] Some judicial decisions have framed the standard as a two-prong test, omitting the equities prong. See, e.g., Walczak, 142 F.3d at 129; E.S., 2010 WL 3835008, at *3.

[11] For disabled children under the age of three, special education services in New York are provided through an Early Intervention Program, which is funded by the New York State Department of Health. See Early Intervention Program website, available at: http://www.health.state.ny.us/community/infants_children/early_intervention/.

transition to preschool, R.K. was evaluated by a Stepping Stone school psychologist. See id. ¶ 3. Two months later, R.K. began receiving special education services through an 8:1+3 full-day preschool program at the Interdisciplinary Center for Child Development ("ICCD"), as well as 1:1 OT and speech and language therapy at ICCD, 30 minutes each, three times per week. See id. ¶¶ 4-5. In September 2007, R.K. also began receiving ABA services at home with a special education itinerant teacher ("SEIT"), for two hours per day, five days per week. See id. ¶ 6.

**B. Recommendations Preceding and Following IEP Meeting**

In December 2007, a DOE social worker, Alfredo Estrella, L.C.S.W., met with the Parents to discuss the process of R.K.'s aging out of the ICCD preschool program. See Def. Rule 56.1 ¶ 16, D.E. #22. The following month, a Committee on Preschool Special Education ("CPSE") Review Team that had been convened by defendant met to create an IEP for the remainder of R.K.'s preschool education. See id. ¶ 72. The CPSE Team recommended, on a 12-month basis, placement in an 8:1+3 class; 10 hours of services provided each week by a SEIT; and 1:1 OT and speech and language therapy, 30 minutes each, three times per week in the classroom or alternate location. See id. ¶¶ 74-76.

Thereafter, on April 29, 2008, a CSE Team met to discuss R.K.'s kindergarten IEP for the 2008-2009 school year. See Def. Rule 56.1 ¶ 78, D.E. #22. The following individuals were present: R.K.'s Parents; a representative of the local school district; a general education teacher; a special education teacher; a parent member of the CSE Team; a school psychologist, Dr. Wanda Enoch; and a school social worker. See id. ¶ 79. The CSE Team discussed the

recommendations and reports of various specialists who had evaluated R.K. since May 2006. See id. ¶ 81.

### *1. Evaluations*

- In May 2006, Tara Krill, M.S., a school psychologist at Stepping Stone, performed various assessments of R.K., observed how she became easily distracted and was "not easily re-directed," and recommended a "small and highly structured pre-school program, or self-contained classroom with related services." Stepping Stone Psychological Evaluation (May 2, 2006) ("Krill Eval.") at 1-4, Conway Ex. B.
- In December 2007, R.K.'s private pediatric neurologist, Dr. John T. Wells, performed a neurological evaluation and recommended that R.K. continue with ABA therapy. See Letter from John Wells, M.D., to Tracy Gallagher, M.D. (Dec. 4, 2007) ("Wells Letter"), Conway Ex. F. Dr. Wells noted a reduction in R.K.'s self-stimulatory behaviors, which plaintiffs now attribute to R.K.'s OT and speech and language therapy and the ABA preschool program at ICCD. See id.; Response to Defendant's Local Rule 56.1 Statement of Material Facts (July 29, 2010) ("Pl. Rule 56.1 Response") ¶ 4, D.E. #32.[12]
- In December 2007, a DOE school psychologist, Chris Stavropoulos, conducted a psycho-educational evaluation to determine an appropriate September 2008 placement for R.K. See Psycho-Educational Evaluation (Dec. 15, 2007) ("Stavropoulos Eval."),

---

[12] Plaintiffs erroneously entered into the electronic court file two copies of their response to Defendant's Rule 56.1 Statement, see D.E. #32 and #34, one of which is blank (D.E. #34). The hard copies of both documents are identical.

Conway Ex. G. Stavropoulos was unable to formally test R.K. because her attention span "was basically non-existent," and she "could not/would not focus, follow directions, or relate in a meaningful way." Id. at 2; see id. at 4. Given her obvious "weaknesses," including "great difficulties maintaining attention to tasks presented her," Stavropolous recommended that she be placed in a "highly structured environment with related services." Id. at 4.

- In a December 2007 Social History Update, DOE social worker Alfredo Estrella, who had witnessed Stavropolous' failed attempt to test R.K., concurred that R.K. "apparently gave up and went out of the cubic[le,] . . . r[a]n in circles and did not . . . attempt to socialize[, and] . . . had difficulties staying within boundaries and became easily frustrated." Social History Update (Dec. 15, 2007) ("Estrella Eval.") at 2, Conway Ex. C. Estrella described R.K's "sensory issues," such as when she "opts to spin around and pigeon walks." Id. Reporting the Parents' belief that R.K. had benefitted from her preschool program, "particularly because the ABA method has been effective," Estrella concluded that R.K. "need[ed] supervision." Id. at 1-3. He recommended, depending on Stavropoulos' assessment and reports from R.K.'s related service providers, a "Specialized Environment as well as a small structured program." Id. at 3.
- In December 2007 and January 2008, R.K. was evaluated by SEIT Laura Spaventa, who had by then worked with R.K. for ten hours per week for at least three months. See Age-Out Report (Jan. 15, 2008) ("Spaventa Eval."), Conway Ex. E; Def. Rule

56.1. ¶ 31, D.E. #22; Pl. Rule 56.1 Response ¶ 8, D.E. #32. Spaventa described R.K.'s high distractibility and other behaviors that made it difficult for her to learn without ongoing guided attention. See Spaventa Eval. at 1. Among other things, she described how R.K. would "try to avoid teacher-directed activities by physically getting up and leaving the area," followed by "jumping and hand-flapping." Id. at 2. Spaventa concluded that R.K. required "1:1 teacher support to effectively function in a classroom setting," and she recommended 1:1 services and continued OT and speech and language therapy. Id. at 5.

- In January 2008, R.K.'s speech and language pathologist, Christina Hartmann, MA CCC-SLP, noted in a progress report that R.K. was engaging in self-stimulatory behaviors ("such as finger-flicking and jumping up and down") and producing inappropriate utterances, all of which significantly interfered with her ability to attend to therapy activities and "to appropriately socially interact." Speech Comprehensive Progress Report (Jan. 15, 2008) ("Hartmann Eval.") at 1-2, Conway Ex. D. Hartmann reported that R.K. responded well "to a small, structured learning environment with limited distractions," and she also recommended continued 1:1 speech and language therapy three times weekly. Id. at 2.
- In January 2008, R.K.'s preschool occupational therapist, Susan Von Rosk, MA, OTR/L, noted in a progress report that despite making some progress, R.K. "still needs adult support to initiate and follow through with the sequence of a task, whether it is a self help, academic or motor activity." OT Progress Report (Jan. 15, 2008) ("Von

Rosk Eval.") at 1, Conway Ex. H; see id. at 3. Von Rosk recommended continued 1:1 OT three times weekly. See id. at 3.

- In January 2008, R.K.'s preschool special education teacher, Tracey Spiro, stated in a comprehensive progress report that R.K. suffered from "significant deficits in all areas of development," including:

> [F]leeting eye contact, limited reciprocal interactions, decreased attention to tasks, and non-functional behavior[, which] continue[d] to interfere with learning, playing and the development of language, peer interactions and ability to engage in classroom activities independently.

Educational Comprehensive Progress Report (Jan. 15, 2008) ("Spiro Eval.") at 2-3, Conway Ex. I; see id. at 1. Like the other evaluators, Spiro described R.K's excessive level of excitability, which would cause her to "jump[] up and down while engaging in finger flicking behavior" and to "engage[] in high rates of repetitive language phrases from familiar songs and TV shows." Id. at 1. According to Spiro:

> These behaviors continue to occur frequently and interfere significantly with her ability to respond to questions, engage in tasks/activities, learn new skills, play and interact with others. While engaged in these non functional behaviors, it is often very difficult to redirect her and she will usually respond only when her name is shouted to gain her attention and refocus her [on] ongoing classroom tasks and activities.

Id. Despite some improvement, R.K. "still require[d] adult support to initiate activities and follow through with the sequence of a task during most activities including self help, academic, social and motor activities." Id. Spiro described the level of support needed as "maximum support" in a 12-month per year "highly structured" and "small group learning environment," "in which target skills are broken down into smaller

steps and presented in a clear and concrete manner."[13] Id. at 2; see id. at 3.

- In January 2008, plaintiffs' private evaluators, clinical pediatric professor Dr. Cecelia McCarton, M.D., and school psychologist Charlotte Amelie Ahlstedt, MS, conducted a comprehensive neurodevelopmental evaluation and psychological observation of R.K.; they found, *inter alia*, that R.K. was "highly distractible and impulsive," "frequently ris[ing] from the testing table and requir[ing] physical direction to return to her seat." McCarton Report (Feb. 5, 2008) ("McCarton Report") at 2, Conway Ex. J. "Her behavior was highly self-directed, as she preferred to scribble on the paper, rather than complete the directed tasks." Id. at 3. The McCarton Report recommended, among other things, ongoing intervention 12 months per year, 7 days a week, in an ABA-based program, with 40 hours of 1:1 ABA therapy weekly, including 15 hours at home; "manding" sessions[14] within each ABA teaching session; OT and speech and language therapy, 60 minutes each, five times a week; and two hours of parent training per week. Id. at 5-6.

- On January 22, 2008, Jane Perlov, a DOE teacher and preschool observer, completed a "Teacher/Preschool Observation Checklist" concerning R.K. and, in response to "Teacher's opinion for kindergarten placement," simply noted, without explanation, "6:1:1." See Teacher/Preschool Observation Checklist ("Checklist") at 2, Conway

---

[13] The process described by Spiro is a hallmark of ABA methodology. See Tr. at 35-36, 47-48, 349-50; see also *infra* note 40.

[14] "In manding sessions, the child is shown reinforcing items and is allowed access if they request them." McCarton Report at 5.

Ex. K. With respect to the item entitled "Attention Span," Perlov noted "fair to poor." Id. at 1.[15]

***2. IEP Meeting***

For the most part, the parties do not dispute what in fact transpired at the IEP meeting on April 29, 2008; rather, they engage in semantic arguments and draw conflicting inferences from the facts adduced.[16] The parties' central disagreement concerns the Parents' level of participation at the IEP meeting; defendant asserts that the Parents "participated," see Def. Rule 56.1 ¶ 80, D.E. #22, whereas plaintiffs claim that the Parents "were not afforded meaningful participation." Pl. Rule 56.1 Response ¶ 17, D.E. #32.

According to the hearing testimony of R.K.'s mother, S.L., the Parents, over the

---

[15] In October 2008, months after the CSE meeting, R.K. was further evaluated, by clinical psychologist Molly Algermissen, Ph.D., and Maureen McSwiggan-Hardin, APRN, BC, NP-P, researchers at Columbia University, who likewise observed that R.K.'s "attention span was quite brief and she needed frequent prompting to remain on task." Research Summary (Sept. 12, 2008) ("Columbia Report") at 3, Conway Ex. A. They concluded that "her frequent self-stimulatory and stereotypic behaviors and restricted and repetitive interests further reduce her availability for more productive interactions with her environment and with other people." Id. at 5. Because they "felt that [R.K.] has more capability than she is currently showing, and she requires more intensive intervention, including home based services and parent training," id., they recommended a small-group or 1:1 ABA school setting; continued home-based ABA therapy; continued OT and speech and language therapy, conducted in collaboration with the ABA team; skill building in self-care and coping skills in both the classroom and at home; and parent training with the supervising ABA therapist. See id. at 6; see also Pl. Rule 56.1 ¶ 5, D.E. #29; but see Defendant's Response to Plaintiffs' "Local Rule 56.1 Statement of Undisputed Facts" (July 30, 2010) ("Def. Rule 56.1 Response") ¶ 5, D.E. #36 (denying these facts, but filing a copy of the referenced report, see Conway Ex. A).

[16] For example, defendant contends that at the meeting, the Parents did not object to the "goals" contained in the IEP. See Def. Rule 56.1 ¶ 90, D.E. #22 (citing Tr. at 150). Plaintiffs counter that the Parents *did* object to the goals, but not until they were able to read the IEP, which was withheld from them until the meeting was breaking up. See Pl. Rule 56.1 Response ¶ 24, D.E. #32; Tr. at 165-66.

course of the meeting, repeatedly brought up the McCarton Report's 1:1 recommendation, but the other members of the CSE Team responded that they would recommend a 6:1+1 class, which they claimed could be structured to provide the kind of 1:1 support recommended by McCarton. See Tr. at 198-99. When the Parents inquired about the specific school that would be offered, the DOE representatives "noted" the Parents' request to consider BAC, id. at 204-05, but responded that a specific site "could not be discussed" and that plaintiffs would receive a placement letter by mail within two weeks. Pl. Rule 56.1 ¶ 9, D.E. #29; Tr. at 204.[17] At the end of the meeting, the Parents, who were under the impression that they were not thereby agreeing to their contents, were asked to and did sign the IEP and "minutes" of the meeting, neither of which they had had an opportunity to read. See Tr. at 195-97.[18]

### *3. The DOE's Recommended Site and Services*

Thereafter, by letter dated June 12, 2008 (which the Parents received the following

---

[17] Although the defense contends that a "proposed educational placement" *was* discussed with the Parents, see Def. Rule 56.1 Response ¶¶ 8-9, D.E. #36, this is nothing more than a contretemps over terminology: the transcript pages referenced by the defense concern the CSE Team's discussion of R.K.'s placement in a 6:1+1 class, not site selection. See Tr. at 143-44, 198-99, 204. It is thus undisputed that the CSE Team refused to discuss the specific school where R.K. would be placed; indeed, defendant has acknowledged that the specific site is not determined at the IEP meeting. See Tr. at 171, 181; see also T.Y., 584 F.3d at 419 (quoting DOE representative as stating that "a specific school placement is never offered at the IEP meeting, and . . . the child's placement is rather determined by a 'citywide placement officer who looks at which school would be the most appropriate.'").

[18] Though the IEP was typed up in advance, the Parents were not given a copy until the meeting ended, and they were denied a copy of the minutes. Tr. at 194-96. The only addition to the IEP that was generated by the meeting was a handwritten summary of the meeting, inserted on the final pages of the IEP. See id. at 194-95; Individualized Education Program for R.K. (Apr. 29, 2008) ("R.K. IEP") at 17-18, Conway Ex. N. (The IEP contains several different and inconsistent pagination systems. The citations herein refer to the handwritten notation on the lower right corner of each page.)

week), the DOE offered R.K. a placement that included a 6:1+1 special education class ("Proposed Class") at "P075Q @ Robert E. Peary Schl" ("P075Q"), and individual OT and speech and language therapy.[19] See Notice of Final Recommendation (June 12, 2008) ("NFR"), Conway Ex. P; see also Tr. at 308; Def. Rule 56.1 ¶¶ 92, 161, D.E. #22. While R.K.'s IEP reflected that she could not participate in school activities without "constant supervision," it nevertheless concluded that her "behavior does not seriously interfere with instruction" and could be addressed by a special education classroom teacher. R.K. IEP at 5, 18. Among other things, plaintiffs object that neither the IEP nor the NFR provided for parent counseling and training or a functional behavioral analysis ("FBA") and behavioral intervention plan ("BIP").[20] See Plaintiffs' Memorandum of Law in Support of Their Motion for Modified *De Novo* Review (July 29, 2010) ("Pl. Mem.") at 9-10, D.E. #30; R.K. IEP; NFR. Plaintiffs also complain that the DOE "unilaterally" issued the NFR, providing no information about the ages and functioning levels of the students in the Proposed Class. Pl. Rule 56.1 ¶ 10, D.E. #29; NFR.

Citing hearing testimony by Leonilda Perez, the teacher in the Proposed Class, the defense describes the DOE's recommended placement and services as follows: the Proposed Class comprised six students ranging in age from four to five, all of whom were diagnosed with autism; a special education teacher with a Masters in Special Education; and a paraprofessional. Def. Rule 56.1 ¶¶ 99, 101, D.E. #22. Throughout the day, the methodology utilized in the

---

[19] Although not specified in the placement letter, R.K.'s IEP provided for OT and speech and language therapy, 30 minutes each, three times per week. See R.K. IEP at 16; see also Def. Rule 56.1 ¶ 94, D.E. #22.

[20] FBAs and BIPs are used to address student behaviors that impede learning. See 8 N.Y.C.C.R.R. § 200.4(b)(1)(v); see also *infra* pp. 36-39, 41-43.

classroom was the Treatment and Education of Autistic and related Communication-Handicapped Children ("TEACCH") approach, pursuant to which each child would rotate to and work individually at various work stations, see Tr. at 33, and each would receive no more than 25 minutes of 1:1 time with ABA methodology. See Def. Rule 56.1 ¶¶ 108-14, D.E. #22.

The Parents visited P075Q, the DOE's proposed school, on June 24, 2008, but were unable to observe classes in session. See Tr. at 307; Def. Rule 56.1 Response ¶ 11, D.E. #36. The Parents notified the DOE by letter dated June 26, 2008 that they were rejecting the recommended placement as inappropriate for R.K. and, absent placement in an appropriate program, would instead seek to implement the recommendations contained in the McCarton Report. See Pl. Rule 56.1 ¶ 12, D.E. #29; Letter from S.L. to Esther Morell (June 26, 2008) ("Rejection Letter"), Conway Ex. Q. The next day, complaining that the DOE had failed to provide R.K. with a FAPE, plaintiffs requested a hearing before an IHO and demanded reimbursement of the tuition for their alternate placement. See Demands for Due Process at 1 (June 27, 2008) ("Due Process Demand"), D.E. #28-3; see also Amended Demand for Due Process (Sept. 30, 2008) ("Amended Due Process Demand"), Conway Ex. T.

**C. R.K.'s Alternate Placement and Services**

R.K. began attending BAC in September 2008. See Def. Rule 56.1 ¶ 178, D.E. #22.[21]

---

[21] During July and August 2008, the DOE continued to provide R.K. with the programs and services specified in her prior (CPSE) IEP, including an 8:1+3 preschool classroom; 1:1 instruction with a SEIT 10 hours weekly; and 30 minutes each of 1:1 OT and speech and language therapy, three times weekly. See Def. Rule 56.1 ¶¶ 176-77, D.E. #22.

After the 2008-2009 school year, the Parents moved to Long Island and enrolled R.K. in a public school. See Arg. at 13, 37-48.

BAC offers 1:1 instruction utilizing ABA methodology. BAC Methodology and Curriculum ("BAC Handbook"), D.E. #40-12. BAC provides "individualized" and "data-driven" programming for each child. Id. ABA-trained instructors work 1:1 with the students, rotating every 30 minutes "to promote generalization across teachers." Id. BAC targets skills "in all domains, including self-care, language skills, socialization, play skills, and pragmatic language." Id. Instructors "record discrete trial data on every skill and graph data daily to track progress and make program adjustments." Id. "[P]arents are required to come in for at least two hours per month and are provided with individual training to transfer skills from the school environment to the home." Id. "All leisure and recreational skills are designed to promote socialization and inclusion in the general community." Id.

BAC has a total enrollment of eight students divided into two classes, with four students in each class. See Tr. at 327, 398. R.K. was assigned to the younger of the two groups, with an age range of five to seven years. See id. at 328. Five adults, including the lead teacher, Tara Cardenas, worked with the four students, thereby providing each student with (at least) 1:1 attention at all times throughout the day. See id. at 349-50. BAC's educational director, Jaime Nicklas, was also in the classroom "all day every day," supervising Cardenas. Id. at 337.

R.K. received 30 minutes each of home-based OT and speech and language therapy three times weekly, paid for by the Parents at a rate of $45 per half hour, and reimbursed by the DOE. See Def. Rule 56.1 ¶¶ 179-80, 186, D.E. #22.

**D. Proceedings Before the IHO**

After plaintiffs sought reimbursement for R.K.'s BAC tuition, a hearing before the IHO was held on January 7-8, 2009. See Def. Rule 56.1 ¶ 184, D.E. #22. The IHO heard testimony from a number of witnesses, including Dr. Wanda Enoch, a DOE school psychologist; Leonilda Perez, the teacher in the Proposed Class; Desiree Sandoval, the parent coordinator at P075Q; S.L., R.K.'s mother; Tara Cardenas, R.K.'s teacher at BAC; and Jaime Nicklas, BAC's educational director. See Pl. Rule 56.1 ¶¶ 17-30, D.E. #29. They testified as follows:

Perez, the teacher in the Proposed Class, "had heard about" R.K. and had reviewed her IEP.[22] Tr. at 29. Based on her review of R.K.'s IEP, Perez believed that R.K. would "benefit from a social setting where she could socialize with other students and throughout different activities." Id. at 37. She concluded that R.K. would fit in with Perez's 6:1+1 class because, like the other students in the class, she was functioning at a pre-kindergarten level, and because her goals were measurable. Id. at 67.

The primary instruction methodology in Perez's classroom, used throughout the day for both group activities and individual student tasks, was TEACCH. See Tr. at 33. Although Perez had never observed 1:1 ABA instruction, see id. at 68, she claimed to use "some of the elemental ABA" -- i.e., "manding" -- during 1:1 instruction, for no more than 25 minutes per day, to teach students specific tasks and to facilitate independence. Id. at 35, 47-48. These are

[22] Perez had never met or worked with R.K. See Tr. at 62.

the methodologies Perez would have used with R.K. See id. at 36. The program would not have been able to provide 1:1 instruction throughout the day, even for a child who needed it. See id. at 98-99.

Enoch, a DOE school psychologist present at the IEP meeting, acknowledged at the hearing that the CSE Team did not develop either an FBA or a BIP for R.K. See Tr. at 140, 144-45. Enoch (who never met R.K.) recalled that at the IEP meeting, Tracey Spiro, R.K.'s preschool teacher, had discounted the need for a BIP, because R.K. "was no behavior problem." Id. at 145.[23] In Enoch's view,"interfering behaviors" are insufficient to warrant a BIP. Id. at 163. Though R.K's self-stimulatory behaviors impeded "her ability to attend to task and to socially interact with others," Enoch believed that R.K. did not need a BIP because her behavior was "not unusual" for an autistic child and because the teachers in the recommended program were accustomed to working with autistic students. Id. at 162. Nevertheless, Perez, the teacher of the Proposed Class, testified that because of the interfering behaviors documented in R.K.'s IEP, once the school year began she would have conducted an FBA by observing the student's performance, and then would have created a BIP in an effort to minimize those behaviors. See id. at 58-61; see also id. at 91-92.

Sandoval, the parent coordinator at P075Q, described at the hearing the kinds of services the school offers to parents. See Tr. at 216. In her position as parent coordinator, she provides a welcome and orientation to new parents, answers questions, and provides resources and

---

[23] In contrast, according to S.L., while Spiro had acknowledged at the meeting that R.K. was not "aggressive" or "disruptive . . . to other children" in the class, she emphasized R.K.'s need for "a very intensive supervised program with lots of adult help" to counteract R.K.'s interfering behaviors. Tr. at 200. There was no discussion at the IEP meeting about an FBA. See id.

outside referrals when families need them. See id. at 217. She also serves as liaison to connect teachers and parents and to schedule appointments at the school for parents. See id. at 217-18. Much of her work involves making outside referrals for parents. See id. at 218-19. She also holds monthly parent meetings at which various agencies are able to orient parents on services they offer. See id. at 221. Some meetings also consist of "workshops" in which an agency or a service provider will educate parents about a particular topic. Id. at 222-23. From time to time the school also provides its own programs to educate parents on methods for working with children with special needs. See id. at 224-25.[24] Parent-teacher conferences are conducted twice a year, and parents are also "free to set up an appointment" with teachers, service providers or an administrator, with Sandoval's assistance. Id. at 228. Home visits are not included as part of the parent training. See id. at 233-35.

BAC, in contrast, *requires* parental involvement. See Tr. at 338. According to BAC's educational director, BAC holds individualized clinic meetings every other week for the parents, at which the director, the parents, and the lead teacher review and discuss the child's individualized program, data, and any needed changes. See id. at 337, 357. In addition, BAC personnel make home visits to provide training and counseling, give parents individual data sheets for their child, and assign parents homework in order to assist with transferring skills to the home environment. See id. at 338. Parents also have the opportunity to try new skills with their children under BAC supervision during clinics. See id.

---

[24] As an example, Sandoval noted that that year, DOE specialists had offered a program on ABA training. See Tr. at 224-25.

While BAC does not offer OT, physical therapy or speech therapy at the school, its students receive such therapies after school, and the school regularly coordinates with the service providers to ensure that the goals within BAC and the therapy goals are consistent and are implemented in both settings. See Tr. at 329-30. Cardenas, R.K.'s lead teacher, confirmed that she was aware that R.K. was receiving OT and speech therapy because she had spoken with the Parents about those services and had furnished them with documentation to give to the service providers to ensure that everyone was "on the same page." Id. at 399-400.

Having considered the testimony and reports of the various evaluators, the IHO found that there was "no one unanimous theory as to whether [R.K.] needs 1:1 or just a highly structured environment," but that there was "a consensus that [R.K.] needs an ABA program . . . ." IHO Decision at 5. Since the Proposed Class used TEACCH methodology and offered only 25 minutes per day of 1:1 support, it was "clearly" not a sufficient level of support for R.K. and was thus "inappropriate." Id. However, the IHO concluded that BAC met only part of R.K.'s needs because it was "1:1 all day despite the recommendation from the student's prior teacher suggesting a small structured environment," and because there were no "integrated efforts" between the classroom teacher and out-of-classroom therapists. Id. The IHO therefore did not award the full tuition reimbursement but instead devised a partial-tuition award based on what appears to be the IHO's erroneous assumption about compensable hourly rates of tuition: mistakenly applying a per-*hour* therapist rate of $45, see id. at 5-6 -- even though the DOE

reimbursement rate for related therapy services was $45 per *half-hour*,[25] see, e.g., Compl. ¶ 39; Tr. at 6; Def. Rule 56.1 ¶¶ 179-80, D.E. #22, and applies to therapy, not to tuition -- the IHO calculated what she deemed to be BAC's hourly rate ($62.50), reduced it to $45 per hour, and computed plaintiffs' award for half of the school day at that reduced rate. See IHO Decision at 5-6. Based on this erroneous calculation, the IHO awarded partial tuition reimbursement in the amount of $32,400.00. See id. at 6.

### E. Proceedings Before the SRO

In March 2009, plaintiffs initiated an appeal from the IHO's decision by filing a Notice of Petition, Verified Petition, and Memorandum of Law with New York's Office of State Review. See Pl. Rule 56.1 ¶ 35, D.E. #29. In April 2009, defendant responded with a Verified Answer and Cross-Appeal challenging the IHO's finding that the DOE's recommended placement was inadequate. See id. ¶ 42. The SRO reversed that decision in June 2009, holding instead that the DOE's recommended placement was adequate and overturning the IHO's award of partial reimbursement. See id. ¶ 43.

## DISCUSSION

## I. STANDARD OF REVIEW

### A. Legal Standard

While parties often characterize their submissions as motions for summary judgment, judicial review of an SRO's decision differs from the usual summary judgment motion. Courts

---

[25] There is no indication that the IHO realized that the rate was $45 per half-hour and intentionally halved the rate for the purposes of the award.

employ a modified standard of *de novo* review, affording the administrative decisionmaker some deference while conducting an independent review of the record to determine whether the school district complied with IDEA. See, e.g., Wall v. Mattituck-Cutchogue Sch. Dist., 945 F.Supp. 501, 507-08 (E.D.N.Y. 1996) ("The court does not use the substantial evidence standard typically applied in the review of administrative agency decisions, but instead must decide independently whether the requirements of IDEA are met. . . . [S]ummary judgment appears to be the most pragmatic procedural mechanism . . . [for determining whether] there has been compliance with IDEA's process and [whether] the child's educational needs have been appropriately addressed.") (internal citations omitted); see also T.Y., 584 F.3d at 418 ("Though the court must show deference to administrative board findings, the court is also empowered to conduct an independent review of the record as a whole and even hear additional evidence.") (citing 20 U.S.C. § 1415(i)(2)(C)). "The court's inquiry is a results-based standard in many respects, concerned more with a just outcome for a disabled student than with judicial efficiency." T.Y., 584 F.3d at 418 (internal citation omitted).

In contrast to typical motions for summary judgment, IDEA calls for courts to use a "preponderance of the evidence" standard in reviewing administrative proceedings, 20 U.S.C. § 1415(i)(2)(C)(iii), and permits judicial resolution of disputed issues of fact. See M.N. *ex rel.* J.N. v. New York City Dep't of Educ., 700 F.Supp.2d 356, 364 (S.D.N.Y. 2010) ("M.N."). Courts must give "due weight" to the administrative proceedings and may not "substitute their own notions of sound educational policy . . . ." Rowley, 458 U.S. at 206. Nevertheless, "the amount of weight" afforded to the administrative proceedings "is subject to the court's exercise

of informed discretion and should be based, in part, on the thoroughness of the administrative findings." Wall, 945 F.Supp. at 507. While a court may not "impose its own view of whether the IEP's goals are appropriate for" the student, the standard of review "does not excuse the SRO from reaching carefully reasoned conclusions." M.H. v. New York City Dep't of Educ., 712 F.Supp.2d 125, 153 (S.D.N.Y. 2010) ("M.H.").

**B. Allegations of Bias**

In an argument repeatedly advanced by plaintiffs' counsel to no avail in other cases, plaintiffs cite the SRO's alleged bias as a basis for decreasing the deference owed to the SRO. See, e.g., W.T. *ex rel.* J.T. v. Bd. of Educ., 716 F.Supp.2d 270, 283-86 (S.D.N.Y. Apr. 15, 2010) ("W.T."); M.S. *ex rel.* M.S. v. New York City Dep't of Educ., --- F.Supp.2d ----, 2010 WL 3377667, at *7 (E.D.N.Y. Aug. 25, 2010) (allegations of bias "have no merit."). Plaintiffs identify two bases for their claim of bias: (1) a conflict of interest on the SRO's part, in that he allegedly lived with an attorney for the New York State Education Department ("SED") (not a party to this action) during the time period in which he reviewed this case, and (2) the SRO's supposed track record of favoring local school districts, according to a statistical analysis proffered by plaintiffs' counsel. See Pl. Mem. at 6-7, D.E. #30; Pl. Rule 56.1 ¶¶ 38-40, D.E. #29; Compl. ¶¶ 17-18, 24-25. To support their allegation of bias, plaintiffs rely on a Wall Street Journal article purportedly raising questions about the SRO's impartiality, see Wall Street Journal Article (July 24, 2007), D.E. #28-8; a "Google" search, see Compl. ¶ 18; and a statistical analysis of the SRO's decisions performed by student interns, see Analysis of SRO Decisions, D.E. #28-9. Defendant requests that these documents be stricken. See Defendant's

Memorandum of Law in Support of Their Motion for Summary Judgment (July 29, 2010) ("Def. Mem.") at 6-7, D.E. #21.

Other courts reviewing the same evidence have rejected it for a variety of reasons. Those courts have correctly concluded that "the Wall Street Journal article constitutes inadmissible hearsay." W.T., 716 F.Supp.2d at 284; accord M.N., 700 F.Supp.2d at 361 n.3; A.D. v. Bd. of Educ., 690 F.Supp.2d 193, 216-17 (S.D.N.Y. 2010) ("A.D."); M.M. *ex rel.* A.M. v. New York City Dep't of Educ., 583 F.Supp.2d 498, 503 (S.D.N.Y. 2008); Student X v. New York City Dep't of Educ., No. 07-CV-2316(NGG)(RER), 2008 WL 4890440, at *4 n.3 (E.D.N.Y. Oct. 30, 2008). Plaintiffs' counsel's "Google" search has similarly been rejected as inadmissible. See W.T., 716 F.Supp.2d at 284. Courts have likewise refused to consider counsel's opinion as to the statistical evidence of bias. See A.D., 690 F.Supp.2d at 216-17 (declining to consider portions of an affirmation by plaintiffs' counsel expressing counsel's "personal belief that the statistics . . . illustrate a bias . . . ."). This lay opinion of bias, unsubstantiated by any expert analysis, is rendered no more admissible by virtue of the fact that plaintiffs in this case opted to incorporate it into their complaint. See Compl. ¶ 28 ("The foregoing statistics, we submit, would amply support a finding of probable, if not actual bias . . . ."); see also id. ¶¶ 19-27.

Furthermore, even if this Court were to consider the statistics as evidence of the SRO's tendency to favor the DOE in his rulings, "statistics alone . . . cannot establish extrajudicial bias." United States v. Int'l Bus. Machs. Corp., 618 F.2d 923, 930 (2d Cir. 1980). "[W]hile Mr. Mayerson's statistics might bolster a claim of bias, the party alleging bias must first

establish a basis for the bias." W.T., 716 F.Supp.2d at 286. Here, plaintiffs proffer only conclusory allegations based on inadmissible hearsay evidence regarding the SRO's romantic life and alleged propensity to "orchestrate his findings" against families with children with special needs. Compl. ¶ 25. As in W.T., this showing is insufficient to establish any legally cognizable basis for bias. See W.T., 716 F.Supp.2d at 285 ("[C]ohabitation with an SED employee -- even one who has some involvement with special education issues -- does not give [the SRO] a 'personal' interest in [the student's] case," sufficient to support a finding of extrajudicial bias.). Consequently, plaintiffs have failed to establish that the SRO suffered from a conflict that diminishes the deference owed to the SRO's opinion.

## II. ***BURLINGTON-CARTER*** TEST

### A. Prong I: Whether the DOE Offered R.K. a FAPE

Prong I of the *Burlington-Carter* test asks whether the school district provided the student with a FAPE, an analysis that entails both procedural and substantive considerations. See Walczak, 142 F.3d at 129. While "not every procedural error will render an IEP 'legally inadequate,'" A.H. v. New York City Dep't of Educ., 652 F.Supp.2d 297, 307 (E.D.N.Y. 2009) ("A.H.") (quoting Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003)), aff'd in part, rev'd in part on other grounds, Nos. 09-3850-cv(L), 09-3920-cv(XAP), 2010 WL 3242234 (2d Cir. Aug. 16, 2010), procedural irregularities, taken together, may satisfy Prong I when they (1) impede the student's right to a FAPE, (2) significantly impede the parents' opportunity to participate in the decisionmaking process, or (3) cause a deprivation of educational benefits. See 20 U.S.C. § 1415(f)(3)(E)(ii); 34 C.F.R. § 300.513(a)(2); see also,

e.g., M.P.G., 2010 WL 3398256, at *2; A.H., 652 F.Supp.2d at 307.

Plaintiffs argue that Prong I has been satisfied here because R.K's IEP suffered from the following substantive and procedural flaws, resulting in the denial of a FAPE: (1) the Parents were not afforded meaningful participation at the IEP meeting; (2) the Parents were not afforded meaningful participation in the placement selection process; (3) the CSE Team failed to conduct an FBA and to provide a BIP as part of the IEP; (4) the IEP did not sufficiently provide for certain services required by law; and (5) the Proposed Class utilized an inappropriate instruction methodology and student-teacher ratio. See Pl. Mem. at 9-10, 12-13, D.E. #30; Compl. ¶ 33; Plaintiff's Memorandum in Opposition of Defendant's Motion for Summary Judgment (July 29, 2010) at 304, D.E. #31.[26] Each of these arguments is addressed in turn.

***1. Lack of Opportunity to Meaningfully Participate in the IEP Meeting***

Plaintiffs allege that the Parents were prevented from meaningfully participating in the IEP meeting. See Pl. Mem. at 12, D.E. #30. Specifically, plaintiffs complain that (1) the Parents were not provided a copy of the draft IEP to work with during the meeting, and (2) the CSE was unresponsive to the Parents' opinions regarding R.K.'s interfering behaviors and the

---

[26] Plaintiffs appear to have abandoned several additional claims. For example, plaintiffs initially complained, among other things, that the DOE's proposed placement failed to ensure that R.K. would be placed with appropriate peers, and deprived R.K. of opportunities to interact with typically developing peers. See Rejection Letter; Amended Due Process Demand. Plaintiffs apparently did not raise these claims before the SRO. See SRO Decision at 11. Other claims were rejected by the SRO but are not being pursued in this Court. See, e.g., id. at 13 (disposing of claim that proposed placement would not begin until September 2008, two months after the start of the 2008-2009 school year); id. at 17-18 (rejecting argument that the CSE Team failed to discuss or individualize proposed goals and objectives at the CSE meeting); id. at 23 (rejecting contention that the school district failed to develop a transition plan for R.K.'s move from preschool to the recommended program).

appropriate student-teacher ratio for R.K.'s class. See id.

To facilitate the provision of a FAPE, IDEA contemplates a "significant role" for parents in the process of developing an IEP for a child with a disability. Winkelman *ex rel.* Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 524 (2007) ("Winkelman") (internal citation omitted). IDEA requires that school districts allow parents to examine all relevant records, see 20 U.S.C. § 1415(b)(1), and include parents in any group, including the IEP team, making decisions about their child's educational placement. See 20 U.S.C. §§ 1414(d)(1)(B), 1414(e). School districts must consider parents' "concerns . . . for enhancing the education of their child" and must "revise the IEP when appropriate to address certain information provided by the parents." Winkelman, 550 U.S. at 524 (citing 20 U.S.C. § 1414(d)).

The record reflects that the Parents did in fact participate in the IEP meeting. They attended the meeting and opined as to what they believed would best serve R.K.'s interests, specifically, 1:1 assistance as recommended by the McCarton Report, as well as placement of R.K. at BAC. See Tr. at 198-205. The CSE Team discussed with the Parents R.K.'s progress and opportunities for 1:1 instruction within the 6:1+1 class that the CSE Team told the Parents it would be recommending. See id. at 198-99, 202-03.

Plaintiffs' real objection is not that the Parents lacked the opportunity to participate in the IEP meeting, but rather that the IEP ultimately did not incorporate their concerns. The IEP need not, however, incorporate "everything that might be thought desirable by loving parents." Walczak, 142 F.3d at 130. A parent's right to a "significant role" in the process simply requires that the CSE consider the parent's concerns and revise the IEP when appropriate. See

Winkelman, 550 U.S. at 524. Whether, in this case, the Parents' concerns warranted inclusion in or modification of the IEP implicates substantive issues concerning the adequacy of the educational program offered by the DOE -- issues addressed in subsequent portions of this opinion.

In another attack on the procedural aspects of the IEP meeting, the Parents assert that the CSE Team failed to provide them with a copy of the IEP for review until the end of the meeting, thereby violating their statutory right to examine all relevant records. See Pl. Mem. at 12, D.E. #30; 20 U.S.C. § 1415(b)(1). Even if true, the relevant inquiry is whether there was a full discussion with the Parents regarding the content of the IEP before the IEP was finalized. See Cerra, 427 F.3d at 193 (where parent participated in discussions at the IFP meeting, parental participation was meaningful even though parent did not receive IEP draft until end of meeting). Nothing in the record suggests that the delay in handing the Parents a copy of the draft IEP prevented them from participating in the IEP discussion. This Court thus finds that the Parents were not prevented from meaningfully participating at the IEP meeting, notwithstanding any incidental IDEA procedural violation.

***2. Lack of Opportunity to Meaningfully Participate in Site Selection***

Plaintiffs further complain that the Parents were not afforded the opportunity for meaningful participation in the placement selection process because the IEP did not specify the recommended placement, allegedly in contravention of New York regulations so requiring. See Pl. Mem. at 14, D.E. #30; 8 N.Y.C.C.R.R. § 200.4(d)(2)(xii) ("The IEP shall indicate the recommended placement."). By "placement," plaintiffs mean a specific school location. See

Pl. Mem. at 15-17, D.E. #30.

As a factual matter, the record indicates that the Parents were involved in the selection of the general placement, but not a specific school site. The DOE sent plaintiffs, at their request, a list of possible schools in plaintiffs' geographic area to enable the Parents to come prepared to the IEP meeting. See Tr. at 206-07. At the IEP meeting, the CSE Team discussed with the Parents the kind of classroom in which R.K. might be placed, see id. at 198-99, but, as per DOE policy, declined to discuss a specific site. Id. at 171, 181, 204; see also *supra* note 17. The CSE Team noted the Parents' request to consider BAC and assured the Parents that they would be sent a placement letter within two weeks of the meeting. Id. at 204-05. Thereafter, the DOE unilaterally selected a specific school site and, nearly a month and a half later, offered it to plaintiffs in a June 12, 2008 notice of final recommendation. See NFR.

Plaintiffs complain that the DOE "unilaterally dictated placement site selection" by choosing a specific site, identified in the NFR, without input from the Parents. Pl. Mem. at 15, D.E. #30. In response, defendant asserts that the Parents' ability to visit the site after receiving the NFR, discuss with the DOE any problems with the site, and request an alternate site, afforded them sufficient opportunity to participate in the site selection. See Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment (July 30, 2010) at 22 ("Def. Response Mem."), D.E. #35.

Contrary to the implications of defendant's argument, the opportunity to visit and discuss a site already unilaterally selected as a "final recommendation" cannot, however, be considered "participation" in selecting that site. Nevertheless, the law does not guarantee

parental participation in site selection. Various courts, including the Second Circuit, have addressed and rejected the claim that an IEP must contain a specific school location. See, e.g., T.Y., 584 F.3d at 419-20; W.T., 716 F.Supp.2d at 289-90. Recently, in T.Y., the Second Circuit extensively analyzed IDEA, its implementing regulations, and background materials, and determined that the DOE's policy of deferring site selection until after the IEP meeting does not deprive parents of their right to meaningful participation in the placement selection, as guaranteed by federal regulations. See 34 C.F.R. § 300.501(b)(1)(i) (providing that "the parents of a child with a disability must be afforded an opportunity to participate in meetings with respect to . . . [t]he identification, evaluation and educational placement of the child."). As the Court of Appeals explained in T.Y., "the term 'educational placement' in the regulations refers only to the general type of educational program in which the child is placed." 584 F.3d at 419 (internal citations omitted). The "general type of educational program" refers, for example, to "classes, individualized attention and additional services a child will receive -- rather than the 'bricks and mortar' of the specific school." Id.[27] Because IDEA does not require the IEP to identify a specific school site, that omission did not render R.K.'s IEP deficient.[28]

---

[27] T.Y. likewise determined that IDEA's reference to the "location" of services, in defining an IEP, see 20 U.S.C. § 1414(d)(1)(A), does not require that the IEP include a specific school site. 584 F.3d at 419. This interpretation of the term "location" is consistent throughout the sources analyzed in T.Y., including commentary of the Senate and United States Department of Education. Id. at 419-20 (collecting authorities).

[28] At oral argument, plaintiffs' counsel asserted that the T.Y. opinion is a narrow one, in that the Second Circuit disclaimed any intent to give the school district "carte blanche . . . to select the school without any parent involvement before the selection . . . is made." 1/13/11 Arg. at (continued...)

Plaintiffs argue that T.Y. is not controlling because it fails to address the New York State regulation, which, according to plaintiffs, mandates that the IEP identify a school site. See Pl. Mem. at 13, D.E. #30. Like the regulations implementing IDEA, the New York regulation cited by plaintiffs simply requires school districts to "indicate the recommended placement" in the IEP. 8 N.Y.C.C.R.R. § 200.4(d)(2)(xii). While plaintiffs argue that this "may afford equal or greater protection" than IDEA, Pl. Mem. at 14, D.E. #30, "placement" is the same term used in IDEA implementing regulations, see 34 C.F.R. § 300.501(b)(1)(i), and discussed in T.Y. Plaintiffs identify no basis for their assumption that New York regulations using this same term impose greater obligations than do their federal counterparts. The failure to identify a specific school site in R.K.'s IEP did not violate New York law.

Equally makeweight is plaintiffs' contention that the DOE's failure to abide by a consent order in Jose P. v Ambach, 79 Civ. 270, 79 Civ. 560, 79 Civ. 2562 (E.D.N.Y. 1988), constitutes "an *independent* basis for a Prong I FAPE deprivation." Pl. Mem. at 16, D.E. #30 (emphasis in original). According to plaintiffs, the Jose P. consent order requires a DOE placement officer to attend the student's IEP meeting and to offer a site by the end of the meeting, but for exceptional circumstances. See id. at 16-17. Plaintiffs further fault the DOE for failing to disclose the Jose P. consent order at the administrative hearing. Id. at 15.

These arguments have previously been rejected by the courts, including the Southern

---

[28](...continued)
16; see id. at 14-15. Plaintiffs' counsel mischaracterizes the paraphrased language in T.Y.: "We emphasize that we are not holding that school districts have carte blanche *to assign a child to a school that cannot satisfy the IEP's requirements*." T.Y., 584 F.3d at 420 (emphasis added).

District of New York in W.T., 716 F.Supp.2d at 289-90. There the court held that the Jose P. consent order does not alter the Second Circuit's (subsequent) holding in T.Y. that an IEP need not identify a specific school site. See W.T., 716 F.Supp.2d at 289-90 & n.15.[29] Plaintiffs articulate no rationale as to why a court-approved settlement in a 1979 case should somehow supersede a decision of the Second Circuit in 2009 holding that an IEP's failure to identify a specific school does not constitute a FAPE deprivation.[30] In any event, plaintiffs waived this argument by failing to raise it during the administrative proceedings. See A.D., 690 F.Supp.2d at 214 n.16.[31]

In conclusion, the Parents were not prohibited from meaningfully participating in selecting R.K.'s placement.

***3. Failure to Conduct an FBA and Create a BIP***

The Parents next complain that the IEP failed to include a functional behavioral analysis (FBA) and behavioral intervention plan (BIP). An FBA is "the process of determining why the

---

[29] As W.T. further noted, the remedy for a violation of a consent order lies with the court that entered that order, not in a separate proceeding. See W.T., 716 F.Supp.2d at 289-90 n.15 (citing Fed. R. Civ. P. 4.1 advisory committee's note).

[30] Plaintiffs' reliance on an SRO decision from 1996 is unavailing, as the decision predated T.Y. and involved a placement offered nearly one month after classes had started. See 1/13/11 Arg. at 5, 23 (citing Application of Bd. of Educ., Appeal No. 96-14 (July 3, 1996) ("SRO 96-14")).

[31] Plaintiffs' counsel, who was admittedly familiar with the Jose P. litigation and decision, claims that he was unaware of the contents of the Jose P. consent order. See 1/13/11 Arg. at 5-6. What he did not know he should have known: The fact that the case settled is well known in the special education community, see id. at 21, and the Jose P. consent order was referenced in the 1996 SRO decision cited by plaintiffs' counsel, see SRO 96-14 at 6, and is a matter of public record, http://www.advocatesforchildren.org/litigation/litdocs/josepdocs/JoseP Stip_Feb93.pdf.

student engages in behaviors that impede learning and how the student's behavior relates to the environment." M.N., 700 F.Supp.2d at 366 (quoting 8 N.Y.C.C.R.R. § 200.1(r)). If a child's behavior impedes her learning or the learning of others, the CSE must arrange an FBA in order to ascertain the contributing factors and to provide a baseline of the student's problem behaviors. See Danielle G. v. New York City Dep't of Educ., No. 06-CV-2152 (CBA), 2008 WL 3286579, at *10 (E.D.N.Y. Aug. 7, 2008) ("Danielle G.") (citing 20 U.S.C. § 1414(d)(3)(B)(i); 8 N.Y.C.C.R.R. § 200.4(b)(1)(v)). Based on the results of the FBA, the CSE then designs a BIP to manage the problem behaviors. See id.; 8 N.Y.C.C.R.R. § 200.22(b). The BIP must include a "baseline measure of the problem behavior; . . . intervention strategies; . . . [and] a schedule to measure the effectiveness of the interventions . . . ." 8 N.Y.C.C.R.R. § 200.22(b)(4). "The FBA is essential to addressing a child's behavioral difficulties, and, as such, it plays an integral role in the development of an IEP." Harris v. District of Columbia, 561 F.Supp.2d 63, 68 (D.D.C. 2008). Because an FBA provides information "central to formulating an IEP tailored to the needs of individual disabled children[,]" courts have recognized the "fundamental connection" between the FBA and "the quality of a disabled child's education." Id.

As the same SRO has acknowledged in other cases, an IEP's failure to provide an FBA and BIP to address behaviors impeding learning may itself constitute the denial of a FAPE. See, e.g., Application of a Child with a Disability, Appeal No. 05-031 (May 6, 2005) ("SRO 05-031") (the failure to provide an FBA where one was needed was a violation "sufficient to constitute a denial of a FAPE"); see also, e.g., Danielle G., 2008 WL 3286579, at *10-11, *15

(reversing findings of IHO and SRO that student's behavior did not necessitate an FBA and BIP, and holding that IEP's failure to include an FBA and BIP, among other deficiencies, deprived student of a FAPE); Lauren P. *ex rel.* David & AnnMarie P. v. Wissahickon Sch. Dist., Civil Action No. 05-5196, 2007 WL 1810671, at *9 (E.D. Pa. June 20, 2007) (ordering reimbursement of tuition where failure to create a BIP constituted denial of a FAPE), aff'd in part, rev'd in part on other grounds, 310 F.App'x 552 (3d Cir. Feb. 12, 2009). This principle is supported by the official commentary to the federal regulations, which expressly states that "a failure to . . . consider and address [behaviors impeding learning] in developing and implementing the child's IEP would constitute a denial of [a] FAPE to the child." SRO 05-031 (quoting 34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Section IV, Question 38).

To be sure, courts have been willing to overlook the absence of an FBA and BIP where the IEP contains alternatives that provide functionally equivalent benefits, such as a 1:1 aide. See T.Y., 584 F.3d at 419 (the failure to create an FBA or BIP did not deny a FAPE because the disabled child already had a 1:1 aide who "provided significant benefits to [the child] in addressing the problematic behaviors"); accord A.C. *ex rel.* M.C. v. Bd. of Educ., 553 F.3d 165, 172-73 (2d Cir. 2009); see also M.H., 712 F.Supp.2d at 158-59 (failure to conduct an FBA did not constitute an IDEA procedural violation where IEP set forth strategy for addressing student's problematic behavior, which "did not rise to the level of interfering with [the child's] learning"); M.N., 700 F.Supp.2d at 366 (an FBA was unnecessary because no claim was made that the student's behavior impeded his learning, and "because the entire [New York Center For Autism] Charter School incorporates the ABA methodology, an individualized

program developed for children with autism that teaches adaptive behavior through the use of positive reinforcement.").

Here, the SRO cited three reasons why, in his opinion, the CSE's failure to include an FBA or BIP in R.K.'s IEP did not constitute a Prong I IDEA violation. SRO Decision at 22. First, even though DOE school psychologist Enoch had never met R.K., see Tr. at 140, the SRO relied on her testimony that R.K.'s self-stimulatory interfering behaviors were "not unusual" for an autistic child and thus did not warrant an FBA or BIP. See SRO Decision at 22; Tr. at 144-45, 162-63. The SRO then held that "to the extent that failing to create an FBA and BIP" resulted in a procedural inadequacy, it did not constitute a Prong I violation because (1) the IEP contained an effective substitute and (2) other testimony at the hearing indicated that the teacher at P075Q would have created a BIP. See SRO Decision at 22.

The SRO's reasoning is legally and factually flawed. First, notwithstanding Enoch's assessment that R.K.'s behavior was "not unusual" for an autistic child, the proper inquiry in determining the necessity of an FBA is whether the behavior impedes learning, not whether the behavior is atypical. See 8 N.Y.C.C.R.R. § 200.4(b)(1)(v) (requiring an FBA when a student's behavior "impedes his or her learning or that of others"); see also Harris, 561 F.Supp.2d at 68 (an FBA is "central to formulating an IEP tailored to the needs of *individual* disabled children") (emphasis added).

The evidence in the record overwhelmingly reflects that R.K.'s interfering behaviors did in fact impede her learning. Evaluations and progress reports consistently found that R.K. was easily distracted and exhibited self-stimulatory behaviors that hindered her ability to learn

without constant and direct supervision. The DOE social worker noted that R.K. "needs supervision" and "a structured and supportive environment . . . ." Estrella Eval. at 1-2. R.K.'s SEIT described her high distractibility and other behaviors that made it difficult to learn without ongoing guided attention; she opined that R.K. required "1:1 teacher support to effectively function in a classroom setting." Spaventa Eval. at 1. R.K.'s speech and language pathologist reported that R.K. engaged in "self-stimulatory behaviors" and produced "inappropriate utterances" that "significantly interfere[d] with her ability to attend to therapy activities . . . ." Hartmann Eval. at 1-2. Her occupational therapist stated that R.K. "require[d] adult prompting and support to initiate and follow through" with tasks. Von Rosk Eval. at 3. R.K.'s preschool teacher described her developmental deficits and "non-functional behavior," which "interfere[d] significantly" with her ability to learn, play, and interact effectively. Spiro Eval. at 1, 3. That same teacher observed that R.K. needed "maximum support" to "decrease non-functional behavior and participate independently" and "to initiate and follow through with most tasks." Id. at 2-3. Indeed, R.K. had such a difficult time maintaining attention to tasks presented her and connecting with the DOE school psychologist that he was unable to test her. See Stavropoulos Eval. at 4.[32]

BAC's educational director, Nicklas, explained that because R.K.'s wide-ranging behavioral problems rendered her unavailable for learning, Nicklas created a BIP for R.K. Tr. at 345-46. Perez, the teacher in the Proposed Class, testified that, based on the reference in

---

[32] The aforesaid evidence likewise supports plaintiffs' argument that R.K. needed high levels of support not provided in a 6:1+1 setting. See *infra* pp. 49-55.

R.K.'s IEP to her difficulties interacting with her peers, Perez would have created a BIP for R.K. See id. at 58-60. While the IEP did not provide for a BIP, see R.K. IEP at 5, it too described numerous behavioral issues that impeded learning: R.K. "demonstrated self-stimulatory behaviors that interfered with her ability to attend to tasks and to socially interact with others"; "engaged in high rates of self-talk and needed a lot of prompting to remain engaged"; and "required guidance and modeling to engage in interactions with adults and peers," including "adult models, verbal cues, and verbal prompts." SRO Decision at 22 (citing R.K. IEP). This behavior is similar to that found by the court in Danielle G. to be sufficiently distracting as to impede learning and to necessitate an FBA, and to warrant overturning the conclusions of the SRO and IHO. See 2008 WL 3286579, at *10-11 (describing a child who engages in self-stimulatory activity, gets distracted easily, and needs prompting to maintain attention). Faced with this overwhelming evidence from R.K.'s evaluators and teachers, defendant conceded at oral argument that R.K.'s behaviors substantially impeded her learning. See 1/13/11 Arg. at 30. The SRO clearly erred in implying otherwise. See SRO Decision at 22.

Contrary to the suggestion of defendant and the SRO that the IEP's "goals and objectives" served as satisfactory substitutes for the FBA and BIP, see 1/13/11 Arg. at 32, 40; SRO Decision at 22 (quoting IEP "objectives" that R.K."decrease [her] use of non contingent utterances" and "transition from one activity to another without running off or engaging in non-purposeful behavior"), the IEP did not include alternative means of adequately addressing R.K.'s interfering behaviors. New York regulations and judicial precedent both require that the

IEP do more than simply describe the problematic behavior and identify "goals and objectives." BIPs must contain "intervention strategies to be used to alter antecedent events to prevent the occurrence of the behavior, teach individual alternative and adaptive behaviors to the student, and provide consequences . . . ." 8 N.Y.C.C.R.R. § 200.22(b)(4). IEPs lacking an FBA and BIP must offer adequate equivalent benefits, for example, by providing the child with a personal aide and/or detailing a strategy to address the interfering behavior. See T.Y., 584 F.3d at 419; M.H., 712 F.Supp.2d at 158-59. Merely describing problematic behavior and listing several goals for improvement are not adequate substitutes for the FBA and BIP.

Finally, where, as here, the record establishes that an FBA and BIP were required, they must be developed by the CSE and incorporated into the IEP. The CSE Team's failure to include an FBA and BIP in R.K.'s IEP at the April 2008 meeting was not cured by testimony nine months later that the child's teacher would have developed the requisite analysis and plan after the 2008-2009 school year began. To hold otherwise flies in the face of the same SRO's rulings in prior cases, that the CSE may not delegate its responsibility vis-à-vis a BIP or FBA. See Application of the Bd. of Educ., Appeal No. 03-062 (Nov. 25, 2003) ("SRO 03-062") (rejecting DOE's argument that the CSE need not incorporate a BIP in the IEP because someone else would develop one later: "[I]t is well settled . . . that 'each CSE has the responsibility to ascertain a pupil's needs and to recommend the necessary services to address those needs, and may not delegate to others the task of determining the amount or nature of those services . . . .'") (citing numerous SRO decisions); accord SRO 05-031 ("A CSE may not delegate its responsibility of developing an appropriate FBA . . . .") (internal citations omitted).

Furthermore, the BIP and FBA must be incorporated into the IEP, which in turn must be provided to the child's parents in advance of the commencement of the school year. The IEP should contain all the services the school district is obligated to provide to or on behalf of the child. See Walczak, 142 F.3d at 122; 20 U.S.C. § 1414(d)(1)(A)(i)(IV). Again, the SRO's ruling in this case disregards his prior decisions: "[T]he regulations specifically direct that a school district must have an IEP in place at the beginning of the school year (34 C.F.R. § 300.342[a]), and that the IEP must be in effect *before* special education and related services are provided (34 C.F.R. § 300.342[b][1][i])."[33] SRO 03-062 (emphasis in original). Consequently, "any related management goals and objectives stemming from the FBA," including the BIP, must at the outset be included in the IEP, before the school district provides special education and related services pursuant to that IEP. SRO 05-031 (citing SRO 03-062; 8 N.Y.C.C.R.R. § 200.4(d)(3)(i)) (additional internal citations omitted). The FBA and BIP cannot play their "integral role" in the development of an IEP adequately "tailored" to a child's individual needs where, as here, those tools would not have been crafted until months after the creation of the IEP. Harris, 561 F.Supp.2d at 68.

More broadly, the Court rejects, as fundamentally flawed, the DOE's invitation to the Court to overlook deficiencies in the IEP based on subsequent testimony that the recommended placement might have later sought to cure those deficiencies. The overarching question for the Court -- as it was for the IHO and SRO -- is whether the school district should be required to

---

[33] Substantially similar federal regulations are now codified as 34 C.F.R. § 300.323(a) and (c).

reimburse plaintiffs for R.K.'s tuition, based on a placement decision that the Parents were constrained to make prior to the start of the 2008-2009 school year. The adequacy of the DOE's proposed placement should be measured against what the DOE actually offered R.K. at that time, not on the basis of information disclosed the following year, at the IHO hearing, as to what that placement might gratuitously have included.[34] In short, the record reflects that R.K.'s behavioral problems impeded her learning and warranted an FBA and BIP. The failure to provide them in her IEP was a substantial omission, which, particularly when coupled with other defects discussed below, deprived R.K. of her right to a FAPE.

#### *4. The IEP Lacked Certain Services Required by Statute*

##### *i. Parent Training and Counseling*

School districts in New York are required to provide autistic children with "parent counseling and training . . . for the purpose of enabling parents to perform appropriate follow-up intervention activities at home." 8 N.Y.C.C.R.R. § 200.13(d). The term "parent counseling and training" is defined by regulation as "assisting parents in understanding the

[34] The Second Circuit has not yet decided whether, in a related context, courts may consider retrospective evidence of the child's progress in assessing the substantive validity of an IEP. See T.P. *ex rel.* S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 251 n.1 (2d Cir. 2009) (citing D.F. *ex rel.* N.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 599 (2d Cir. 2005)). District courts within this Circuit have held, however, that the court's task is to "determine the appropriateness of a placement prospectively, without the benefit of a school year's worth of hindsight." W.T., 716 F.Supp.2d at 292 n.17 (citing Antonaccio v. Bd. of Educ., 281 F.Supp.2d 710, 724 (S.D.N.Y. 2003) (collecting out-of-circuit cases)); accord J.R. v. Bd. of Educ., 345 F.Supp.2d 386, 395 (S.D.N.Y. 2004) (judicial evaluation of the IEP is "necessarily prospective in nature; we therefore must not engage in Monday-morning quarterbacking . . . , but rather consider the propriety of the IEP with respect to the likelihood that it would benefit [the child] at the time it was devised.").

special needs of *their* child; providing parents with information about child development; and helping parents to acquire the necessary skills that will allow them to support the implementation of *their* child's individualized education program." 8 N.Y.C.C.R.R. § 200.1(kk) (emphasis added). The parent training and counseling services to which all families with autistic students are entitled must be detailed in the student's IEP. See 8 N.Y.C.C.R.R. §§ 200.1(qq), 200.4(d)(2)(v)(a); see also Danielle G., 2008 WL 3286579, at *14 ("[T]he parental counseling services provided to [the child's] parents should have been detailed in [the child's] IEP.") (citing 34 C.F.R. § 300.347(a)(3), now codified as 34 C.F.R. § 300.320(a)(4), which requires that the services "to be provided to the child *or on behalf of the child*" -- including under state law, parent training and counseling services -- be incorporated into the IEP) (emphasis supplied by Danielle G.). Indeed, the same SRO has previously held that parent training and counseling "must be identified on the IEP as a related service." SRO 05-031; accord Application of a Child with a Disability, Appeal No. 00-016 (Apr. 20, 2001) ("SRO 00-016"). It is insufficient merely to advise parents of available parent counseling and education options, or to develop such options after the IEP is created. See SRO 00-016 (agreeing with the IHO that where parent counseling and education were not included in the IEP, "the Board of Education could not meet the regulatory requirements by merely advising parents that parent counseling and education was [*sic*] available.").

In this case, the SRO expressly acknowledged that R.K.'s IEP contained no provisions for parent counseling and training. See SRO Decision at 20; R.K. IEP. This omission clearly violated New York regulations mandating that parents of autistic students receive counseling

and training and that these services be included in the IEP. See 8 N.Y.C.C.R.R. §§ 200.1(qq), 200.4(d)(2)(v)(a), 200.13(d). Despite these regulations and prior administrative decisions, at least one of which was authored by SRO Kelly, the SRO condoned the lack of parent counseling and training in this case, reasoning that "the hearing record shows that counseling and training would have been available at the district's recommended school." SRO Decision at 20. The portion of the record on which the SRO relied consisted of the hearing testimony of parent coordinator Sandoval before the IHO about parent counseling and training options at P075Q. See id. Sandoval was not, however, present at the IEP meeting, see Def. Rule 56.1 at 79, D.E. #22, nor is there any evidence that the school district provided the Parents with information about parent counseling and training options in or before the NFR. Furthermore, as an SRO has previously held, subsequent testimony that parent training would have been provided does not redeem an IEP's failure to include it. See Appeal No. 00-016.[35]

***ii. Speech and Language Therapy***

For autistic children, New York state regulations in effect when R.K.'s IEP was created required speech/language instruction for a minimum of 30 minutes daily in groups not to exceed

[35] In any event, the counseling and training options described in Sandoval's testimony do not appear to constitute the kind of individualized assistance envisioned by the state regulations. See 8 N.Y.C.C.R.R. § 200.1(kk) (describing parent counseling and training as "assisting parents in understanding the special needs of *their* child . . . [and] helping parents to acquire the necessary skills that will allow them to support the implementation of *their* child's individualized education program") (emphasis added). Although Sandoval outlined various generalized resources and coordination efforts that P075Q typically makes available to parents, see Tr. at 220-29, she did not describe any training or counseling aimed at helping parents implement their child's individualized education program, other than twice yearly parent-teacher conferences and parents' ability to "set up an appointment" with school personnel. Id. at 228.

two, or 60 minutes daily in groups not to exceed six. See 8 N.Y.C.C.R.R. § 200.13(a)(4).[36] R.K.'s CSE Team recommended 30 minutes of 1:1 speech and language therapy only three times per week. See Def. Rule 56.1 ¶ 94, D.E. #22. The SRO justified this shortfall because testimony at the IHO hearing described activities incorporating some speech and language elements into the routine of the Proposed Class. See SRO Decision at 21. The SRO may not, however, substitute his concept of appropriate speech and language services for that already identified by law. See, e.g., W.T., 716 F.Supp.2d at 291 (finding it "troubling" that the SRO's decision overrode regulatory requirements, substituting "the views of a single administrative judge for . . . [standards] arrived at through a regulatory process."). The classroom-wide speech and language activity referenced by the SRO would not have been individualized for R.K., nor was it particularized (as to duration or otherwise) in her IEP.

Defendant argues that omitting from the IEP services required by law "does not constitute the denial of [a] FAPE where the record otherwise makes clear" that such services would nevertheless be provided. Def. Mem. at 26, D.E. #21 (citing T.Y., 584 F.3d at 418-19). Judicial precedent does not support the broad loophole posited by the DOE. Rather, on the facts presented in T.Y., the Second Circuit ruled that the IHO and SRO had "suitably corrected" the IEP's deficiencies (with regard to speech and language services and parent

[36] 8 N.Y.C.C.R.R. § 200.13(a)(4) was amended, effective December 8, 2010, removing the requirement that autistic children receive language services "a minimum of 30 minutes daily in groups not to exceed two, or 60 minutes daily in groups not to exceed six," and requiring instead that "[i]nstructional services shall be provided to meet the individual language needs of a student with autism."

training),[37] and the Court of Appeals declined to second-guess the SRO's "thorough and well-reasoned" opinion that the particular omissions, standing alone, were insufficient to render the IEP "as a whole substantively deficient." 584 F.3d at 418-19; see also W.T., 716 F.Supp.2d at 292-93 (where the SRO made a "detailed and reasoned" determination that the student's classmates were sufficiently similar in terms of chronological age, cognitive abilities and skills, IEP's technical violation as to grouping of students did not deny student a FAPE). Here, in contrast, the SRO glossed over the IEP's inadequacies rather than remedying the problems. In concluding that the IEP's deficits did not deny R.K. a FAPE, the SRO largely recited the facts of the case, rather than articulating a detailed rationale meriting deference. See SRO Decision at 21.

Finally, while each regulatory violation may not in isolation deprive a student of a FAPE, the Court must assess *all* of the alleged deficiencies collectively to determine whether the IEP "as a whole" was sufficient for R.K. T.Y., 584 F.3d at 419. The failure to provide adequate speech and language therapy and parent training and counseling in R.K.'s IEP not only violated legal requirements, but, when taken together with other flaws, constituted significant deficiencies that deprived R.K. of a FAPE.[38]

---

[37] For example, the IHO "ordered that the IEP include an additional three hours of speech and language therapy per week." T.Y., 584 F.3d at 417.

[38] Although the Parents admitted that they were satisfied with the amount of therapy proposed, the record indicates that they would have wanted more but were under the mistaken belief that R.K. was receiving as much therapy as the law allowed. See Tr. at 274-75 (S.L. testified that "both the speech therapist and the occupational therapist who work with [R.K.] have said that she would benefit with more. But we are trying to stay within these legal boundaries, whatever that means.").

### 5. *Insufficient 1:1 and ABA Instruction*

Plaintiffs' primary challenge to the appropriateness of the placement offered by the DOE concerns the student-teacher ratio of, and the pedagogical methodology utilized in, the Proposed Class. Plaintiffs complain that R.K. needed significant 1:1 ABA instruction, whereas the Proposed Class involved a 6:1+1 ratio, with only 25 minutes of 1:1 time per day with an instructor, who used TEACCH methodology almost exclusively.[39] See Rejection Letter at 1.

Perez, the teacher in the DOE's recommended placement, stated that ABA differs from TEACCH in that "ABA is more one to one instruction." Tr. at 83.[40] Perez incorporates ABA elements during brief 1:1 instruction to teach a child how to request something or do a specific task or activity to build the child at "whatever level they are." Id. at 35. In contrast, using TEACCH for much of the school day, Perez sends children to work stations to "do work individual[ly] on their own." Id. at 33.

In concluding that "the recommended placement was inappropriate," the IHO observed that while the record did not reflect any "unanimous theory" as to whether R.K. "needs 1:1 or

---

[39] The only other 1:1 time consisted of an aggregate of three hours of therapy per week.

[40] ABA methodology is frequently 1:1 in nature, and is inherently individualized, as the instructor or therapist assesses the particular child's behavior; breaks desired skills down into small, discrete steps; and reinforces positive behavior according to the needs and progress of that child. ABA is extremely intensive, often involving 25 to 40 hours of effort per week. See generally Healing Thresholds (autism website), Applied Behavior Analysis for Children with Autism, Factsheet (Dec. 21, 2009), http://autism.healingthresholds.com/therapy/applied-behavior-analysis-aba; Center for Autism and Related Disorders Website, What is Applied Behavior Analysis? http://www.centerforautism.com/Getting_Started/ABA.asp (last visited Jan. 20, 2011); Parker Autism Foundation Website, Frequently Asked Questions, What is ABA Therapy? http://www.parkerautismfoundation.org/faq.html (last visited Jan. 20, 2011).

just a highly structured environment," there emerged "a consensus that the student needs an ABA program . . . ." IHO Decision at 5. Because the Proposed Class used primarily TEACCH instead of ABA methodology, and lacked the requisite level of 1:1 support that R.K. needed, the IHO ruled that R.K. had been denied a FAPE. See id.

On administrative appeal, the SRO rejected the IHO's assessment and instead concluded that "the hearing record shows that the CSE considered the private evaluations, and the IEP and recommended placement reflected some of the recommendations from each of the various professionals who had worked with or evaluated" R.K. SRO Decision at 19. The DOE's recommended placement was sufficient, in the SRO's view, because the 6:1+1 class would have provided R.K. with a small, highly structured classroom environment and the opportunity to work with peers, along with individual ABA instruction. See id. For this reason, the SRO concluded that the DOE's recommended placement did not deny R.K. a FAPE. See id. at 19-20.

While the SRO's opinion contains an exhaustive recitation of the evaluations, see SRO Decision at 2-6, 8-9, its brief analysis of this critical issue misses the mark in several respects. As a preliminary matter, the fact that the CSE Team (and then the SRO) may have reviewed all the evaluations (see id. at 19) does not create a presumption -- and certainly not an irrebuttable one -- that the resulting placement met R.K.'s needs. Similarly, the fact that a 6:1+1 class might have provided some limited 1:1 ABA instruction[41] does not, without more, support the

[41] "The [DOE's] proposed program offers approximate[ly] 25 minutes per day of 1:1 . . . ." IHO Decision at 2; see Tr. at 47-48, 78.

conclusion that the placement would have provided R.K. with *sufficient* ABA and individual instruction. On the contrary, the record unequivocally establishes, and the IHO found, that R.K. needed far more individualized support than the Proposed Class would have provided.

Every evaluator who commented specifically on teaching methodology recommended that R.K. continue to receive ABA instruction, which had proved effective in delivering the level of support she needed in order to focus on the tasks at hand.[42] Beginning in September 2007, R.K. was enrolled in an ABA preschool, see McCarton Report at 1, and, in addition, received ten hours per week of 1:1 ABA services at home with a SEIT. See Spaventa Eval. at 1. The SEIT teacher commented that R.K. had made "significant progress" with this form of intervention and recommended that she continue receiving the services. See id. at 5. DOE social worker Estrella also attributed R.K's improvement to the ABA method. See Estrella Eval. at 3. In December 2007, R.K.'s pediatric neurologist recommended continuation of ABA instruction. See Wells Letter. Likewise, the comprehensive McCarton Report prepared in January 2008 recommended an ABA-based program. See McCarton Report at 5-6. A second comprehensive evaluation, made in connection with a Columbia University study, also endorsed ABA instruction at school and at home. See Columbia Eval. at 6.[43] Not surprisingly, faced with these recommendations from the specialists, the IHO found that there was "a consensus

---

[42] A number of evaluators, including but not limited to several who had worked with R.K., did not specify by name any particular methodology. See, e.g., Hartmann Eval.; Von Rosk Eval.; Spiro Eval.; Krill Eval.; Stavropoulos Eval.; Preschool Checklist.

[43] This evaluation, which occurred after the DOE offered R.K. an NFR, was introduced at the hearing before the IHO. See IHO Decision at 5.

that [R.K.] needs an ABA program . . . ." IHO Decision at 5.[44]

In any event, whether or not they expressly endorsed by name the ABA methodology, every expert who had worked with and/or observed and evaluated R.K. concluded that the child needed high levels of support and supervision.[45] Though there was no unanimous theory about precisely how that support should be delivered, the evidence that R.K. required 1:1 support is overwhelming. The SEIT teacher, who had worked with R.K. for a number of months before evaluating her, found, in January 2008, that R.K. required "1:1 teacher support to effectively function in a classroom setting," and she recommended 1:1 services. Spaventa Eval. at 1, 5. The McCarton Report -- the comprehensive neurodevelopmental evaluation and psychological observation conducted in January 2008 -- concluded that R.K. needed, *inter alia*, 40 hours of 1:1 ABA support weekly. McCarton Report at 5-6. R.K.'s occupational and speech and language therapists each recommended 1:1 therapy. See Hartmann Eval. at 1-2; Von Rosk Eval. at 3. R.K.'s preschool teacher recommended "maximum support" within a "highly structured learning environment." Spiro Eval. at 2. Other evaluations, also without specifying a particular student-teacher ratio, recommended a small, highly structured environment, and emphasized R.K.'s need for consistent and direct support.[46]

---

[44] Defendant's suggestion that the McCarton Report's conclusions were aberrational (see 1/13/11 Arg. at 41) is belied by the record.

[45] For a more detailed discussion of the record, see *supra* pp. 11-16, 39-41.

[46] These include the May 2006 early intervention evaluation, see Krill Eval. at 4 (recommending a "small and highly structured" environment), as well as assessments from a DOE social worker who had never worked with R.K., see Estrella Eval. at 3 (recommending a "Specialized Environment as well as a small structured program," pending the results of
(continued...)

In contrast, in developing R.K.'s IEP, the CSE Team had before it only a single "evaluation" -- an observation checklist devoid of any explanation -- that recommended a 6:1+1 placement despite compelling evidence of R.K.'s intensive support needs. See Preschool Checklist at 2. At the administrative hearing, the IHO heard testimony from two DOE witnesses who retroactively endorsed the checklist recommendation: Enoch, the DOE school psychologist, and Perez, the teacher in the Proposed Class. See Tr. at 67, 153. As neither had either met or evaluated R.K. or witnessed 1:1 ABA instruction,[47] see id. at 29, 68, 140, 153, the IHO was understandably unimpressed by their opinions, and found that the proposed placement "was inappropriate," in that it "clearly did not have the level of support (25 minutes of 1:1) needed for this student." IHO Decision at 5.

The IHO's conclusion that the Proposed Class could not provide the requisite level of support for R.K. was well-founded. The Proposed Class used primarily TEACCH methodology, where children performed "individual" work, "on their own," with only "some of the elemental ABA" during short periods of 1:1 instruction. See Tr. at 33, 35. More importantly, although the record clearly establishes that R.K. tended to be distracted *most* of the

---

[46](...continued)
R.K.'s as yet incomplete evaluations); and the DOE school psychologist unable to formally test R.K. because of her difficulty maintaining focus, see Stavropoulos Eval. at 4 (recommending a "highly structured environment" and related services).

[47] In fact, because Perez had never observed 1:1 ABA instruction, the IHO precluded her from expressing her view as to whether 1:1 ABA instruction was appropriate for R.K. See Tr. at 67-68.

time and to require adult support to initiate and follow through with *most* activities,[48] the Proposed Class was a 6:1+1 environment in which students received a *maximum* of 25 minutes a day of 1:1 teacher support. See Tr. at 27, 47-48, 78. As both Perez and defense counsel acknowledged, the kind of ongoing support recommended by nearly all the evaluators simply could not be provided in a classroom with six students and two adults, providing each student with 25 minutes of 1:1 support daily. See id. at 98-99; 1/13/11 Arg. at 39.

In rejecting the IHO's conclusion, the SRO relied on the fact that "the professionals who worked with or evaluated the student offered varied program recommendations . . . ." SRO Decision at 18. In fact, while some of those evaluators may not have incanted the magic words "1:1" or "ABA," the substance of their reports makes clear that they all agreed that R.K. needed constant, direct support to stay on task -- a level of support impossible to provide in a 6:1+1 setting. The SRO wrongly assumed that those evaluators who advocated a "small, highly structured classroom environment" were implicitly rejecting 1:1 support. See SRO Decision at 19 (citing Tr. at 155). Contrary to the assumption of defendant[49] and the SRO -- as well as school psychologist Enoch, on whose testimony the SRO relied -- 1:1 support is not inconsistent with a small, structured classroom setting and interactions with the child's peers.[50]

---

[48] See *supra* pp. 11-16, 39-41.

[49] See 1/13/11 Arg. at 24.

[50] In this regard, the IHO's reasoning is similarly faulty. After concluding that the proposed 6:1+1 placement deprived R.K. of a FAPE, the IHO reduced the amount of tuition reimbursement on the ground that BAC "meets only part of the student's special education needs[,]" in that "[t]he student has 1:1 all day despite the recommendation from the student's prior teacher suggesting a small structured environment." IHO Decision at 5.

In fact, that is precisely the environment provided by ABA schools such as BAC[51] and the New York Center for Autism Charter School, a state-approved public school that offers classes of four students with four instructors who rotate among the students. See M.N., 700 F.Supp.2d at 361-62, 367.

### *6. Conclusion Regarding Prong I: The DOE Denied R.K. a FAPE*

The record amply supports the IHO's finding that R.K. needed ABA instruction and high levels of support and supervision, and that this support would not have been provided in the Proposed Class, a 6:1+1 placement. In overturning the IHO's ruling, the SRO overlooked the wealth of evidence on which the IHO's ruling rested; instead, the SRO characterized plaintiffs' objections as an attempt to substitute Dr. McCarton's views for those of the DOE and its evaluators. See, e.g., SRO Decision at 19-20 (concluding that "the district's failure to adopt the frequency of individual instruction recommended by one [evaluator] did not result in the denial of a FAPE . . . ."). In fact, as the IHO noted, various evaluators agreed on the need for ABA instruction and for a greater level of support than could be provided in a 6:1+1 setting with minimal 1:1 assistance. The DOE's recommended placement was thus inappropriate and denied R.K. a FAPE.

Additionally, in analyzing and ruling on each alleged violation in isolation, the SRO neglected to address their cumulative effect. R.K.'s IEP suffered from various other deficiencies, such as the failure to incorporate an FBA and BIP, and the failure to provide for parent training and counseling, all of which contributed to a FAPE denial. The omission of an

[51] See *infra* pp. 58-59.

FBA and BIP was particularly significant, as they are tools designed to address the kinds of interfering behaviors that R.K. displayed; absent an FBA and BIP, these behaviors were likely to continue to impede her learning and development. Similarly significant is the absence of a mandate for parent training and counseling, services aimed at enabling parents to adapt what their child learns at school to the home environment, thereby reinforcing the educational process. See, e.g., Tr. at 338-39. Collectively, these deficiencies deprived R.K. of significant educational benefits and thereby denied her a FAPE. See 20 U.S.C. § 1415(f)(3)(E)(ii).

**B. Prong II: Whether BAC was Appropriate to R.K.'s Needs**

Having concluded that the DOE deprived R.K. of a FAPE, the Court turns to the second prong of the *Burlington-Carter* test, which asks whether the private placement was "appropriate to the child's needs." Frank G. v. Bd. of Educ., 459 F.3d 356, 363 (2d Cir. 2006) ("Frank G.") (citing Burlington, 471 U.S. at 370; Carter, 510 U.S. at 12-13). Parents seeking reimbursement bear the burden of proof on this issue. See id. at 364; N.Y. Educ. L. § 4404(1)(c). To be eligible for reimbursement, however, the private placement need not meet federal or state educational standards. See Carter, 510 U.S. at 14; Frank G., 459 F.3d at 364; M.S. *ex rel.* S.S. v. Bd. of Educ., 231 F.3d 96, 105 (2d Cir. 2000) (observing that the "test for the parents' private placement is that it is appropriate, and not that it is perfect.") (internal citation and quotations omitted), abrogated on other grounds by Schaffer v. Weast, 546 U.S. 49 (2005). Nor must parents show "that a private placement furnishes every special service necessary"; all that is required is that the alternate placement "provides educational instruction specially designed to meet the unique needs of a handicapped child." Frank G., 459 F.3d at

365 (internal citations omitted). As with the evaluation of the DOE's recommended placement, the core issue is whether the private placement is "reasonably calculated to enable the child to receive educational benefits." Id. at 364 (citing Rowley, 458 U.S at 207); see also Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007) (an appropriate private placement is one that is "likely to produce progress, not regression.") (internal citations omitted). "No one factor is . . . dispositive" of this issue; rather, courts must consider "the totality of the circumstances . . . ." Gagliardo, 489 F.3d at 112 (quoting Frank G., 459 F.3d at 364-65).

While a reviewing court must give the administrative decisions "due weight," it need not defer to reasoning unsupported by the record, as is the case here. See, e.g., A.D., 690 F.Supp. at 207 (overturning the SRO's decision, despite the obligation to give administrative officers "due weight," because it did not "properly" analyze the evidence in the record). The IHO held that the BAC private school placement met only "part of [R.K.'s] special education needs," in that it provided (1) "no therapies in the classroom" and "no integrated efforts between therapists and the teacher," and (2) 1:1 instruction throughout the day despite a recommendation for "a small structured environment." IHO Decision at 5. The IHO's decision provides no further reasoning for this conclusion, nor for the flawed computation used to calculate a partial tuition award. See id. at 5-6.[52] The SRO, having concluded that plaintiffs failed to satisfy Prong I, did not reach the Prong II issue. See SRO Decision at 23. However, in the course of his decision, he cited testimony by DOE psychologist Enoch critiquing 1:1 instruction as contrary to R.K.'s best interest "to be in a setting where she could interact" with

[52] See *supra* pp. 24-25.

adults or peers. See id. at 19; see also Tr. at 153-55.

These aspects of the administrative decisions misconstrue the evidence and evaluations. The record, as detailed earlier in this opinion, established R.K.'s need for ABA instruction and intensive support. At BAC, R.K. received 1:1 ABA instruction from a board-certified ABA instructor with nine years of experience. See BAC Handbook at 1; see also Tr. at 327, 342-43, 348-49. BAC's program corrected deficiencies in R.K.'s IEP. BAC's director created a BIP for R.K. based on data collection and discussed it with the Parents so that they could implement the program at home. See Tr. at 275, 345. BIPs and curricula were reviewed and adjusted weekly, based on extensive data collection and graphing. See id. at 354-56. BAC required parental involvement and provided parents with individual training "to transfer skills from the school environment to the home." BAC Handbook at 1; see Tr. at 338. BAC's parent training included monthly home training sessions; homework for parents; and individualized bi-weekly parent clinics wherein the BAC director, lead teacher and parents discussed programming and needed changes, and at which parents could utilize various techniques with their child under BAC's guidance. See Tr. at 273, 337-38.

While the administrative opinions appear to regard 1:1 instruction and a "small structured environment" as mutually exclusive, the record reflects that BAC *was* a small structured environment that *also* provided the intensive 1:1 support that R.K. needed: BAC's 1:1 program afforded R.K. opportunities to interact with adults and peers. She was assigned to one of two classrooms, each of which had four students. See Tr. at 327-28, 398.[53] Five adults

[53] The record refutes defense counsel's claim that R.K. was in a classroom with one student (continued...)

worked with these four students in regular, structured rotations throughout the day "to promote generalization across teachers." BAC Handbook at 1; see Tr. at 328, 349-50. BAC also designed leisure and recreational activities "to promote socialization and inclusion in the general community." BAC Handbook at 1.

Despite the IHO's contrary assumption, the alleged absence of "integrated efforts" between therapists and teachers is an insufficient basis on which to deny or reduce reimbursement. Although BAC did not provide related therapy services, see Tr. at 302-03, R.K., like other BAC students, received OT and speech and language therapy after school. See id. at 274-75, 279-80, 329. According to Nicklas, BAC's director, BAC staff would "coordinate with service providers on a regular basis" to create consistency across all environments. Id. at 329-30. The existence of such coordination was corroborated by Cardenas, R.K.'s lead teacher, who testified that she discussed therapy with the Parents and provided the therapists with information about R.K. to ensure that R.K.'s classroom goals and BIPs were carried over into therapy. See id. at 399-400. This exchange of information between BAC staff and R.K.'s therapists was "reasonably calculated" to enable R.K. to receive educational benefits. See Gagliardo, 489 F.3d at 112 (quoting Frank G., 459 F.3d at 364). Any suggestion that this therapy arrangement violated IDEA or state requirements overlooks the fact that any such shortcoming constitutes but a single factor in evaluating the placement as a whole. See, e.g., Frank G., 459 F.3d at 364-65; see also M.N., 700 F.Supp.2d at 367 (where

---

[53](…continued)
and that BAC therefore did not provide her with a small, structured environment. See 1/31/11 Arg. at 25, 29.

autistic child was placed in New York Center for Autism Charter School, which provided "intensive ABA instruction throughout the school day," pursuant to an "individualized academic program for each student based on that student's needs," the curriculum alone, which addressed his "deficits in language and social skills," provided the student with a FAPE, even though the school did not offer related services).

In sum, the record clearly establishes that the BAC private placement provided an education specifically designed to meet R.K.'s unique needs. See Gagliardo, 489 F.3d at 115. BAC afforded R.K. the high level of individual support she required, opportunities to interact with peers and adults, and additional services designed to generalize her progress across other environments. BAC reviewed the program on an ongoing basis to fulfill and adapt to R.K.'s needs. For all these reasons, this Court finds that BAC constituted a program reasonably calculated to enable R.K. to progress and was therefore an appropriate placement for her, within the meaning of Prong II.

**C. Prong III: The Equities**

Even where the DOE placement is found to be inadequate and the parents' private placement adequate, "courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant . . . ." A.D., 690 F.Supp.2d at 205 (citing Forest Grove Sch. Dist. v. T.A., 129 S.Ct. 2484, 2496 (2009)); see also 20 U.S.C. § 1412(a)(10)(C)(iii)(III) (tuition reimbursement awards may be reduced or denied "upon a judicial finding of unreasonableness with respect to any actions taken by the parents."). Recent judicial opinions have construed this "discretion" as a third prong of the *Burlington-Carter* test. See, e.g., W.T., 2010 WL

1737756, at *15; M.P.G., 2010 WL 3398256, at *2.[54]

Parents have a statutory right to seek a unilateral placement if the school district fails to offer a FAPE. See 20 U.S.C. § 1412(a)(10)(C). Parents are responsible for notifying school districts of their dissatisfaction so that school authorities have an opportunity to respond. See A.H., 652 F.Supp.2d at 313 ("If plaintiff had raised her strong concerns and her intention to enroll at [a specific private school] at the time of the CSE meeting . . . , defendant would have had an opportunity to respond to her concerns."); cf. Ivan P. v. Westport Bd. of Educ., 865 F.Supp. 74, 82 (D. Conn. 1994), aff'd, 101 F.3d 686 (2d Cir. 1996) (parents were entitled to reimbursement where the record reflected their efforts to communicate their dissatisfaction to defendant school board). Courts have denied reimbursement where parents arranged unilateral placements "without ever notifying the school board of their dissatisfaction with their child's IEP." M.C. *ex rel.* Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 68-69 (2d Cir. 2000) ("M.C.") (citing, e.g., Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149, 158 (3d Cir. 1994) (the right of review creates "a corresponding parental duty to unequivocally place in issue the appropriateness of an IEP."). Courts distinguish permissible private placements and "transfers made truly unilaterally, bereft of any attempt to achieve negotiated compromise and agreement . . . ." Town of Burlington v. Dep't of Educ., 736 F.2d 773, 799 (1st Cir. 1984), aff'd, 471 U.S. 359 (1985).

Defendant alleges that the Parents' conduct "demonstrates that they wanted R.K. to attend BAC as soon as they visited that school, and never made an effort to work with the

---

[54] The IHO did not address this issue, see IHO Decision at 5-6, and the SRO's ruling on Prong I made it unnecessary for him to reach the equities prong. See SRO Decision at 23.

Defendant to address their concerns about the IEP." Def. Mem. at 32, D.E. #21; 1/13/11 Arg. at 18-21, 42. In support of its theory, defendant alleges the following facts: (1) plaintiffs submitted an application to BAC before the 2008 IEP meeting; (2) plaintiffs signed an enrollment contract with BAC for the 2008-2009 school year and made a non-refundable deposit of $1,000 to secure R.K.'s place before receiving the DOE's NFR; and (3) plaintiffs submitted a due process complaint shortly after receiving the NFR. See id. at 32-34. Defendant accuses the Parents of giving the school district an ultimatum: "[F]ind a placement that provide[s] the same program and services recommended by the McCarton report and offered by BAC; or we will place R.K. in BAC and look to you for reimbursement." Id. at 32.

Defendant's account draws negative inferences from facts that are at least equally susceptible to innocuous explanations. In fact, the record shows the Parents' history of working with the DOE. Plaintiffs, who accepted DOE preschool special education and services for R.K., see Def. Rule 56.1 ¶ 4, D.E. #22, met with DOE representatives to plan for R.K.'s transition out of preschool. See id. ¶ 16. More than six months prior to the commencement of the 2008-2009 school year, plaintiffs allowed the DOE and private evaluators to assess R.K. in preparation for an IEP meeting to plan her 2008-2009 placement. See, e.g., id. ¶¶ 16, 24, 30.

The record further establishes that the Parents communicated their concerns to the school district. They shared the McCarton Report with the CSE Team before the IEP meeting, and expressed at the meeting their concern that the CSE recommendation accommodate the needs described in that report, including R.K.'s need for intensive support. See Tr. at 197-98. The Parents informed the CSE Team that they had been looking at various education options,

private and public, and that while BAC had offered R.K. a placement, plaintiffs were waiting to see what happened with the CSE. Id. at 204-05. At the CSE meeting the Parents inquired about a specific school site but were told the subject could not be discussed. See id. at 204. The CSE Team announced that it would recommend a 6:1+1 placement, and that a 6:1+1 classroom could meet R.K.'s need for 1:1 instruction. See id. at 198-99, 203-04. The CSE Team assured the Parents that a placement letter would be sent within two weeks of the April 29th meeting. See id. at 204. The DOE mailed the NFR to the Parents on or about June 12, 2008. See NFR.

The Parents visited P075Q on June 24, 2008, but were unable to observe a functioning class in operation. See Tr. at 209, 307; Rejection Letter at 1. By letter dated June 26, 2008, the Parents objected to the DOE's recommended placement and requested assistance in placing R.K. "in an appropriate program that comes as close to meeting the McCarton report recommendations as possible." Rejection Letter at 2. The letter then advised that, absent an appropriate placement, plaintiffs would "seek to implement Dr. McCarton's recommendations as much as possible" and would request reimbursement. Id. Because the school year began on July 1, see Tr. at 307-08; Def. Response Mem. at 22, D.E. #24; 1/13/11 Arg. at 18, 21, plaintiffs sought due process review the following day. See Due Process Demand. Plaintiffs nevertheless communicated their willingness "to meet in the context of a resolution meeting." Id. at 4. They reiterated that invitation in their amended demands on September 30, 2008. See Amended Due Process Demand at 5. R.K.'s mother explained at the hearing that plaintiffs would have accepted a compromise had the DOE offered additional 1:1 instruction beyond the

minimal amount available in the Proposed Class, but the DOE never responded to their objections to the NFR or suggested other options. See Rejection Letter at 1 ("We could compromise on the total 1:1 hours, but the difference [between the approximately half hour a day typically provided in classes like the Proposed Class and the McCarton Report's recommendation of 40 hours a week] is far too great."); see also Tr. at 270, 303-04.

The Parents acknowledge applying to BAC and investigating other schools before the 2008 IEP meeting. See Tr. at 205-06. They applied for the lottery at the New York Center for Autism Charter School, a public, lottery-based, ABA model with one instructor per student. See id. at 205, 259-60; M.N., 700 F.Supp.2d at 361-62, 367. They also visited Hawthorne Annex, Learning Spring, and Manhattan Children's Center, and contacted another school, which had no openings. See Tr. at 205. The Parents even tried to visit a 6:1+1 public classroom before the CSE meeting but were told that visits were not permitted until they had an IEP. See id. at 206. On May 7, 2008, after the CSE Team declared its intent to recommend a 6:1+1 program but before receiving the NFR, the Parents signed a contract with BAC and paid a non-refundable processing fee of $1,000; they took out a home equity loan and made an initial tuition payment of $42,500 on or about June 1, 2008. See id. at 263-64; Def. 56.1 ¶¶ 157-59, D.E. #22. The BAC contract expressly provided that BAC would release plaintiffs from responsibility for tuition payments under the contract and reimburse plaintiffs for all but the $1,000 processing fee in the event that R.K. enrolled in a DOE-recommended placement by September 10, 2008. See Def. 56.1 ¶ 160, D.E. #22.; see also Tr. at 263-67.

Plaintiffs acted reasonably under the circumstances, working with the school district in

good faith and keeping the school district informed of their concerns. Absent further evidence that the Parents never intended to seek a public school placement, the Court declines to infer bad faith on the part of the Parents, who sought to educate themselves about various school options and to make arrangements to preserve their options should the DOE's recommended placement prove to be inadequate. In light of the CSE Team's statement that it would recommend a 6:1+1 classroom, the Court rejects the defense contention that enrolling R.K. at BAC prior to receiving the NFR evidences bad faith. Plaintiffs' filing of a due process complaint, though hasty, was not unreasonable, given the DOE's delay in sending the NFR, the imminence of the new school year and plaintiffs' need to preserve their legal rights. See Tr. at 307-08. Even after serving their due process complaint, the Parents invited the DOE to propose a compromise, but none was forthcoming.

This case thus bears no resemblance to those cases in which courts have denied tuition reimbursement based on equitable considerations. See Carmel Cent. Sch. Dist. v. V.P. *ex rel.* G.P., 373 F.Supp.2d 402, 404-05, 417-18 (S.D.N.Y. 2005) (parents did not seek a CSE evaluation until just before the start of the school year, then enrolled their child in a private school without giving the school district a realistic chance to evaluate the child and formulate an IEP); M.C., 226 F.3d at 68-69 (parents "failed to raise any issue" regarding the extent or nature of a particular service provided for the student in the IEP until "at least eight months after [the] treatment . . . had ended."); A.H., 652 F.Supp.2d at 313 (plaintiff, who was contractually "bound" to pay full tuition before receiving the NFR, had not raised her concerns at the CSE meeting, depriving the CSE team of adequate time to respond to her concerns). In

contrast, plaintiffs here worked with the DOE on an ongoing basis and communicated their concerns in a timely manner. Though they made early contingency plans with BAC, they were not bound to pay tuition if the DOE provided an appropriate placement. They sought the DOE's assistance in better addressing R.K.'s needs and the DOE failed to respond.

For the foregoing reasons, this Court finds that the equities do not preclude or diminish plaintiffs' entitlement to an award of tuition reimbursement.

## CONCLUSION

In sum, plaintiffs have carried their burden of showing that the DOE failed to offer R.K. a FAPE for the 2008-2009 school year and that BAC was an appropriate placement for R.K. Furthermore, the equities do not warrant a denial or reduction of tuition reimbursement. This Court therefore recommends that plaintiffs' motion for summary judgment be granted and that defendants' cross-motion be denied, and that defendants be ordered to pay full tuition reimbursement to plaintiffs in the amount of $85,000.

Any objection to the recommendations contained in this Report and Recommendation must be filed with the Honorable Kiyo A. Matsumoto on or before February 7, 2011. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a)(1), 72(b)(2); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

**SO ORDERED.**

**Dated:** **Brooklyn, New York**
**January 21, 2011**

**ROANNE L. MANN**
**UNITED STATES MAGISTRATE JUDGE**